THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GEORGE HURT, Defendant-Appellant.

Second District   No. 2—86—0985

Opinion filed November 7, 1988.

REINHARD, J., dissenting in part.

G. Joseph Weller and Patrick M. Carmody, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan, and Richard L. Salon, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LINDBERG delivered the opinion of the court:

A 12-count information filed in the circuit court of Lake County charged defendant, George Hurt, with one count of attempt (murder), four counts of armed violence, four counts of aggravated battery, two counts of aggravated assault, and one count of unlawful use of weapons. An amendment to the information added a second count of attempt (murder) (count XIII), which was later dismissed. Following a trial, a jury returned verdicts on the remaining 12 counts. The jury found defendant not guilty of attempt (murder) (count I) (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4(a), 9—1(a)(1)), armed violence (attempt (murder)) (count II) (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4(a), 9—1(a)(1), 33A—2), aggravated battery (great bodily harm) (count III) (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(a)), armed violence (aggravated battery (great bodily harm)) (count IV) (Ill. Rev. Stat. 1985, ch. 38, pars. 12—4(a), 33A—2), aggravated battery (permanent disability) (count XI) (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(a)), and armed violence (aggravated battery (permanent disability)) (count XII) (Ill. Rev. Stat. 1985, ch. 38, pars. 12—4(a), 33A—2). The jury found defendant

guilty of aggravated battery (peace officer) (count V) (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(6)), armed violence (aggravated battery (peace officer)) (count VI) (Ill. Rev. Stat. 1985, ch. 38, pars. 12—4(b)(6), 33A—2), aggravated battery (deadly weapon) (count VII) (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(1)), unlawful use of weapons (count VIII) (Ill. Rev. Stat. 1985, ch. 38, par. 24—1(a)(4)), aggravated assault (deadly weapon) (count IX) (Ill. Rev. Stat. 1985, ch. 38, par. 12—2(a)(1)), and aggravated assault (peace officer) (count X) (Ill. Rev. Stat. 1985, ch. 38, par. 12—2(a)(6)). Defendant was sentenced to six concurrent terms of imprisonment: 12 years for armed violence; five years for each of two counts of aggravated battery; and one year for each of two counts of aggravated assault and one count of unlawful use of weapons. Defendant appeals from these convictions.

Defendant contends that (1) he was not proved guilty beyond a reasonable doubt, (2) he was improperly convicted of multiple offenses based upon a single physical act, (3) he was denied a fair trial by improper remarks during the State's closing argument, and (4) his sentence was based upon improper factors and was excessive. We affirm in part, vacate in part, and remand for resentencing.

The State's evidence tended to establish that at 4:30 a.m. on March 11, 1986, Kathleen Garland was at work as a radio dispatcher for the Round Lake police department. Officer Philipp Scarlette of the Round Lake Heights police department arrived to work on a report.

Defendant, who had snow on his hair and jacket, entered the police station and complained to Garland that he had been beaten. Because all of her department's officers were out on calls, Garland asked Scarlette to check on defendant. Scarlette led defendant from the front lobby, through a security door, and into a hallway.

Scarlette asked defendant to take his right hand out of his pocket. Defendant did so, producing a .22 caliber semiautomatic pistol. He pointed the pistol at Scarlette's face. According to Scarlette, defendant said he was going to kill Scarlette, that he wanted Scarlette to kneel, and that he wanted Scarlette's weapon. According to Garland, defendant said, "I'm going to put one between your eyes." Scarlette grabbed the gun and pushed it up. The gun discharged and the bullet went through Scarlette's finger.

The two men separated. Defendant ran through the lobby, out the front door, and headed south. Scarlette fired two shots through the window next to the front door, followed defendant through that door, and fired two more shots at defendant. After the last shot, defendant fell down.

Scarlette approached cautiously and heard defendant moaning. He

did not at first understand defendant, but later understood defendant to say he wanted to die. Other officers arrived, some of whom testified that they saw and heard defendant sobbing and asking an officer to kill him. Defendant also asked why he was still there. One of the officers, who rolled defendant over to check him for injuries, detected a moderately strong odor of alcohol on defendant's breath.

Later, after he had been placed in a cell, defendant said, "God said you guys were supposed to take care of me. Why am I still here?" About an hour later, defendant appeared to be considerably calmer than when he was arrested. Defendant then asked where his car was and whether he had been arrested for driving under the influence.

Forty-one rounds of .22 caliber ammunition were found in defendant's pants pocket. A forensics expert tested the pistol defendant had used. It was a double-action pistol, which when cocked had a trigger pull of 5 to 5½ pounds and when uncocked had a trigger pull of 16½ to 17 pounds. When the expert received the weapon, there was a discharged cartridge under the firing pin. It had what appeared to be a double strike mark on it. However, on test shells the expert had fired only once, similar double strike marks appeared. The expert had no opinion as to whether the trigger had been pulled twice while the discharged cartridge was under the firing pin.

Defendant raised a voluntary intoxication defense. (Ill. Rev. Stat. 1985, ch. 38, par. 6—3(a).) Defendant's evidence tended to establish that after his 1983 divorce and the loss of custody of his daughter, Melissa, he began drinking alcohol heavily. Defendant had experienced several alcohol-related blackouts since that time.

Defendant bought the handgun, his first, in order to commit suicide. He had once gone so far as to cock the pistol and have it next to him, but when he thought about Melissa he broke down crying and could not go through with it. In the two weeks prior to the incident at bar, defendant made statements his mother interpreted as indicating he was going to kill himself and said to a friend that he wanted to shoot himself with the pistol.

The day before the shooting, defendant played pool and drank beer and shots of whiskey in the afternoon. He went to the Golden Country, where he sang and played country music. There, he started drinking beer but switched to Black Russians. While defendant could not recall how many drinks he had, the total bill for it came to about $30 and drinks cost about $1.75 or $2 apiece. Defendant left at about the 2 a.m. closing time, and he recalled his girlfriend, Martha Jones, driving them home. He did not recall them stopping at his parents'

home, as Jones testified they did. Defendant did not remember the rest of that early morning, including Scarlette and the shooting, due to a blackout. The next thing he recalled was waking up on the floor of the jail. He testified that he had not intended to harm anyone that night.

Dr. Sharon Strauss testified as an expert in clinical psychology. She gave him a battery of tests and interviewed him. In her opinion, based on the tests, defendant was very truthful in his answers.

Defendant is borderline mentally retarded. He was also suffering from depression with psychotic features and was an alcoholic. Defendant had left school in the eighth grade, by which time he had already developed his depression. He started drinking at around 15 years of age, very early becoming an alcoholic. He has been an alcoholic since that time, with a period of remission during his marriage. When his wife left him, he returned to alcohol. He drank pretty steadily up to the time of the shooting incident. Since that time, he had been trying very hard to stay off of alcohol, at which he had been doing a very good job.

Defendant was suicidal. He had been prevented from killing himself by his desire to spare Melissa the stigma of having a father who had committed suicide. In Strauss' opinion, defendant's actions on March 11, 1986, had been taken to provoke the police into killing him, which to him would have been preferable for his daughter to his killing himself.

In response to both direct and cross-examination, Strauss gave several opinions with respect to defendant's mental state at the time of the shooting. On direct examination by the defense, she testified:

"Q. Doctor, based upon all the evaluations, and the foregoing testing that you had with George Hurt, do you have a professional opinion whether or not George could have intended to harm anyone on the night in question?

A. I don't believe he could.

Q. What is that based upon, Doctor?

A. George's personality profile shows him to be a very passive individual. He's just the opposite of the criminal type of personality that we frequently see in these kinds of cases.

One of the reasons that he's depressed is because he holds his anger inward, turns it inward towards himself, and hates himself rather than other people. He cannot mobilize his anger at all, that's why he's suicidal.

* * *

Q. Doctor, do you have an opinion, based upon all of the

foregoing, whether or not George Hurt could appreciate the criminality of his actions on the night in question?

\* \* \*

A. Yes, I do.

Q. What is that opinion, Doctor?

\* \* \*

A. I believe he could not appreciate the criminality of his acts on the night in question.

\* \* \*

Q. Based upon your testing which you have given to George, and the evaluations that you have conducted with him, based upon his level of intoxication, as you know it to have been on the night in question, and his past condition of alcoholism, do you have an opinion as to whether or not he was able to conform his conduct to the requirements of law?

\* \* \*

A. Yes, I do.

Q. And what is that opinion?

A. I believe that he could not conform his behavior to the letter of the law."

On cross-examination by the State, Strauss testified:

"Q. Doctor, is preparation to perform an act a factor which is indicative of knowledge or intent?

A. Not necessarily.

Q. \*\*\* Can it be a factor?

A. It can be.

Q. \*\*\* And if you follow through on those preparations and those plans, isn't that something that's indicative of knowledge or intent?

A. It can be.

Q. And when you put all three of those together, that's a further indication of knowledge and intent, isn't it?

A. It's possible.

Q. So, if all that is possible, then, it's also possible that the defendant did, in fact, know and intend to do the acts that he performed on that night, isn't it?

A. Not given the state of intoxication that he was in.

Q. Of course, you only have his word to go on how intoxicated he was, don't you?

A. That's true."

In response to questioning by the State, Strauss also testified that about a quarter of her practice was from the Lake County criminal

defense bar and that "I would love to work for the state, [but] they don't retain me."

Defendant first argues that his convictions must be reversed because the State failed to sustain its burden of proof with respect to his voluntary intoxication defense. When an affirmative defense other than insanity is raised in a criminal case, "the State must sustain the burden of proving defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 3—2(b).) Voluntary intoxication is an affirmative defense. (Ill. Rev. Stat. 1985, ch. 38, pars. 6—3(a), 6—4.) Therefore, the State has the burden of proof beyond a reasonable doubt as to the issue of voluntary intoxication when that defense is sufficiently raised.

The provision defining the defense at issue states:

"A person who is in an intoxicated *** condition is criminally responsible for conduct unless such condition ***:

(a) Negatives the existence of a mental state which is an element of the offense ***." (Ill. Rev. Stat. 1985, ch. 38, par. 6—3(a).)

(But see Ill. Rev. Stat. 1987, ch. 38, par. 6—3(a) (same provision as amended effective January 1, 1988).) It is therefore necessary to know what mental states are elements of the offenses of which defendant was convicted in order to evaluate the sufficiency of the evidence on the defense of voluntary intoxication.

The counts of the information charging defendant with the offenses of which he was convicted all alleged that he had acted knowingly. The jury instructions on all of the offenses of which defendant was convicted, except for unlawful use of weapons (see *People v. Remon* (1976), 40 Ill. App. 3d 337, 340, 352 N.E.2d 374, 376), required the State to prove beyond a reasonable doubt "[t]hat at the time of the offense, the defendant was capable of acting knowingly." (See Illinois Pattern Jury Instructions, Criminal, No. 24—25.02A (2d ed. 1981).) Section 4—5 of the Criminal Code of 1961 provides:

"A person knows, or acts knowingly or with knowledge of:

(a) The nature or attendant circumstances of his conduct, described by the statute defining the offense, when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists.

(b) The result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct.

Conduct performed knowingly or with knowledge is performed wilfully, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning." (Ill. Rev. Stat. 1985, ch. 38, par. 4—5.)

For defendant's convictions to have been proper, the evidence had to prove beyond a reasonable doubt that the existence of this mental state was not negatived by defendant's intoxication. Ill. Rev. Stat. 1985, ch. 38, pars. 3—2(b), 6—3(a), 6—4.

It is well established:

> "Voluntary intoxication is a defense to a specific intent offense *** if the condition of intoxication negates or makes impossible the existence of the mental state which is an element of the crime. [Citations.] In other words, the degree of intoxication which will absolve the defendant of responsibility for his criminal conduct must be so extreme that it suspended entirely the power of reason [citations], or rendered the defendant wholly incapable of forming the requisite intent to commit the crime in question. [Citation.] The mere fact that the defendant was drunk or intoxicated does not constitute a defense of intoxication." (*People v. Crosser* (1983), 117 Ill. App. 3d 24, 27-28, 452 N.E.2d 857, 861.)

(See also *People v. Olson* (1981), 96 Ill. App. 3d 193, 195, 420 N.E.2d 1161, 1163.) Accordingly, "[t]he State need not introduce any evidence to show that defendant was not intoxicated to any extent" since "[t]here are many degrees of intoxication through which an individual may pass before reaching the level of intoxication" that constitutes a defense to a criminal charge. (*People v. Hayes* (1976), 37 Ill. App. 3d 772, 774, 347 N.E.2d 327, 329.) It has also been held:

> "A jury is not required to accept the conclusions of a psychiatrist with respect to this issue. [Citation.] Rather, the weight to be given any testimony relating to the mental state of the defendant is peculiarly within the province of the jury [citation], and where the evidence admits of two inferences, a reviewing court will not substitute its judgment unless the jury's decision is inherently impossible or unreasonable. [Citation.]" (*People v. Olson* (1981), 96 Ill. App. 3d 193, 197, 420 N.E.2d 1161, 1164.)

The jury's decision at bar was not inherently impossible or unreasonable.

There was evidence from which the jury could properly conclude that defendant was capable of acting knowingly at the time of the shooting. We refer primarily to the manner in which he acted that morning. His being able to go from his parents' home to the police

station; thinking to carry the pistol; feigning injuries and making up a story about being beaten to get past the security door in the lobby; making statements sufficiently coherent to be understood by Garland, Scarlette, and the other police officers who arrived just after the shooting; and being able to flee all tend to indicate that he was not so intoxicated that he was incapable of acting knowingly or that his power of reason was entirely suspended. (*People v. Crosser* (1983), 117 Ill. App. 3d 24, 27-28, 452 N.E.2d 857, 861.) If the jury also believed that defendant was attempting to provoke the police into killing him so that he would not have to kill himself, the conclusion that he was capable of acting knowingly would be bolstered by his ability to make and carry out such an elaborate plan.

Defendant had been drinking and was probably to some degree intoxicated at the time of the shooting. That alone is insufficient to require reversal of the jury's verdicts. (*People v. Crosser* (1983), 117 Ill. App. 3d 24, 27-28, 452 N.E.2d 857, 861.) Dr. Sharon Strauss did testify, on cross-examination, that it was not possible that defendant knew and intended to do the acts that he performed that morning given his state of intoxication. However, the jury was not required to accept the conclusions of this clinical psychologist with respect to this issue. (See *People v. Olson* (1981), 96 Ill. App. 3d 193, 197, 420 N.E.2d 1161, 1164.) The evidence on this issue admitted of more than one inference, and the jury's decision was not inherently impossible or unreasonable. We therefore will not disturb that decision. See *People v. Olson* (1981), 96 Ill. App. 3d 193, 197, 420 N.E.2d 1161, 1164.

We next address the third issue raised by defendant. In his argument on that issue, defendant contends:

> "The prosecutor's closing argument improperly appealed to the jurors as taxpayers, made repeated and spurious attacks on the defendant and the defendant's expert witness, including attacks that the expert's opinion was influenced by her zeal to collect a fee; all of these factors thereby denying defendant a fair trial."

The remark which defendant contends was an improper appeal to the jurors as taxpayers was not objected to by defendant. None of the allegedly improper remarks were raised in defendant's post-trial motion. This issue has therefore been waived, as it is necessary to both object and raise an issue in a post-trial motion to preserve it for review. *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129-30.

Moreover, we will not review this issue as a matter of plain error. (107 Ill. 2d R. 615(a).) Supreme Court Rule 615(a) provides:

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (107 Ill. 2d R. 615(a).)

Our supreme court has said:

"[T]hat this rule does not mandate that a reviewing court consider all errors involving substantial rights whether or not the same have been brought to the attention of the trial court. In other words, Rule 615(a) does not operate in the nature of a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court. *** [T]he rule has been designed as a means of meliorating the harshness of the strict application of the general waiver rule.

Before plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed." (*People v. Precup* (1978), 73 Ill. 2d 7, 16-17, 382 N.E.2d 227, 231.)

In the case at bar, it is not plainly apparent from the record that an error affecting substantial rights was committed.

Defendant contends that he was denied a fair trial by prejudicial remarks made by the prosecutor during his rebuttal closing argument. The jury's verdicts do not reflect any prejudice to defendant. Instead, they show that the jury made some very careful, and in some cases very fine, distinctions based upon the evidence before it.

The jury found that defendant was not proved beyond a reasonable doubt to have been capable of acting intentionally; or that he was not proved beyond a reasonable doubt to have intended to kill Scarlette; or that he was not proved beyond a reasonable doubt to have taken a substantial step toward the commission of murder, as demonstrated by its verdicts of not guilty of attempt (murder) and of armed violence (attempt (murder)). (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4(a), 9—1(a)(1), 33A—2.) On the other hand, the jury found that defendant was proved beyond a reasonable doubt both to have been capable of acting knowingly and to have acted knowingly, as demonstrated by its verdicts of guilty of aggravated battery (peace officer), armed violence (aggravated battery (peace officer)), and aggravated battery (deadly weapon). (Ill. Rev. Stat. 1985, ch. 38, pars. 12—4(b)(1), (b)(6), 33A—2.) The jury also found that the evidence did not prove beyond a reasonable doubt that the shooting either caused great bodily harm, as demonstrated by its verdicts of not guilty of aggravated battery (great bodily harm) and armed violence (aggravated battery

(great bodily harm)), or caused permanent disability, as demonstrated by its verdicts of not guilty of aggravated battery (permanent disability) and armed violence (aggravated battery (permanent disability)); but that the evidence proved beyond a reasonable doubt that the shooting had caused bodily harm, as demonstrated by its verdicts of guilty of aggravated battery (peace officer), armed violence (aggravated battery (peace officer)), and aggravated battery (deadly weapon). (Compare Ill. Rev. Stat. 1985, ch. 38, pars. 12—4(a), 33A—2, with Ill. Rev. Stat. 1985, ch. 38, pars. 12—4(b)(1), (b)(6), 33A—2 (where jury instructions on aggravated battery (peace officer) and aggravated battery (deadly weapon) required proof beyond a reasonable doubt of bodily harm in order to convict).) Finally, we note that all of the verdicts returned were completely consistent with each other.

It is not readily apparent from the record that defendant was denied a fair trial by prejudicial remarks by the State in its rebuttal closing argument, when the jury made such obviously careful, often fine, and always consistent distinctions in the verdicts it returned. We therefore will not review this issue as a matter of plain error. 107 Ill. 2d R. 615(a); *People v. Precup* (1978), 73 Ill. 2d 7, 17, 382 N.E.2d 227, 231.

■ We next address the second issue raised by defendant. Defendant was found guilty of, and sentenced for, aggravated battery (peace officer), armed violence (aggravated battery (peace officer)), aggravated battery (deadly weapon), unlawful use of weapons, aggravated assault (deadly weapon), and aggravated assault (peace officer). Defendant argues that "[a]ll of these convictions and sentences, with the exception of the most serious, armed violence, must be vacated because they are based on the same physical act." See, *e.g.*, *People v. Mack* (1984), 105 Ill. 2d 103, 137, 473 N.E.2d 880, 898, *vacated on other grounds* (1987), 479 U.S. 1074, 94 L. Ed. 2d 127, 107 S. Ct. 1266; *People v. Donaldson* (1982), 91 Ill. 2d 164, 170, 435 N.E.2d 477, 479-80; *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.

The State concedes that three of the six convictions must be vacated, but contends that the other three should be affirmed. The State argues:

> "First, when defendant entered the station with a gun knowingly concealed in this [*sic*] pocket he clearly committed unlawful use of weapons before taking any further action. ***
>
> Next, when defendant removed the gun from his pocket, stated that he was going to kill Officer Scarlette and asked for

Scarlette's gun the defendant committed aggravated assault without taking any further actions. These physical and verbal actions on defendant's part obviously put Scarlette in apprehension of receiving a battery, the latter of which elements is not contained in armed violence as charged herein. Such aggravated assault was proven under either theory of aggravated assault charged. *** Thus one of the two convictions for aggravated assault may still stand.

Finally, when defendant shot the officer he committed several forms of aggravated battery and armed violence. *** [U]nder *People v. Donaldson* *** and *People v. Mack* *** only the armed violence conviction may stand for this action on defendant's part. But the act warranting such conviction was separate and apart from those giving rise to defendant's convictions for aggravated assault and unlawful use of weapons."
(See Ill. Rev. Stat. 1985, ch. 38, pars. 12—2(a)(1), (a)(6), 12—4(b)(1), (b)(6), 24—1(a)(4), 33A—2; *People v. Mack* (1984), 105 Ill. 2d 103, 473 N.E.2d 880, *vacated on other grounds* (1987), 479 U.S. 1074, 94 L. Ed. 2d 127, 107 S. Ct. 1266; *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477.) We agree with the State. Accordingly, we vacate defendant's convictions for aggravated battery (peace officer) (count V), aggravated battery (deadly weapon) (count VII), and aggravated assault (peace officer) (count X).

■ In his argument on his fourth issue, defendant contends that his "twelve year term of imprisonment was based on improper considerations and was excessive." In the first part of this issue, defendant argues that "[t]he trial court improperly considered defendant's convictions which had been entered in violation of the rule against multiple convictions based on the same physical act."

Defendant was originally sentenced on October 22, 1986, to concurrent terms of imprisonment of 15 years for armed violence; five years each for the two counts of aggravated battery; and one year each for unlawful use of weapons and for the two counts of aggravated assault. On October 31, 1986, defendant filed a "Motion to Modify Sentence" alleging that "[t]he Defendant was sentenced to fifteen years in the Department of Corrections on or about October 20, 1986," and requesting the trial court "to ammend [*sic*] the sentence imposed to a minimum sentence of six years in the Illinois Department of Corrections."

At the November 6, 1986, hearing on the motion to reconsider defendant's sentence, the court said:

"The defense makes a great issue out of being found not

guilty of attempt murder, which is absolutely true. But the jury did find him guilty of an equally serious matter, armed violence. What did he have? Unlawful use of weapon, guilty of aggravated assault—two counts, guilty; aggravated battery, two counts—guilty; armed violence, guilty. \*\*\*

\* \* \*

The Court having then considered the evidence at trial, and the pre-sentencing report at that time, and now the petition and response thereto, the evidence presented today, arguments of counsel, the evidence of the witness today in regard to the defendant's mental capacity, reduces his sentence to twelve years."

Thus, the "Motion to Modify Sentence" sought only to have the 15-year term of imprisonment for armed violence reduced to six years. The trial court's statement that defendant's sentence was reduced to 12 years, without any reference to the sentences for the other offenses, makes it clear that the court was considering only reduction of the sentence for armed violence at the November 6, 1986, hearing. In this context, the trial court's statement referring to all of the offenses of which defendant was found guilty demonstrates that the trial court considered all of the convictions, including the three we are vacating, to be factors supportive of the imposition of a longer sentence for armed violence.

The State maintains that "give[n] the Court's imposition of separate sentences on these various offenses, no remand is necessary, particularly since, in context, the Court's comments [quoted above] were merely a response to a defense argument that the not guilty verdict on attempt murder warranted a lower sentence." We disagree. Assuming *arguendo* the State is correct in characterizing the trial court's remarks as "merely a response to a defense argument that the not guilty verdict on attempt murder warranted a lower sentence," it is obvious that the court in those remarks was mentioning all of the guilty verdicts, including those forming the bases for the three convictions we are vacating, as facts which, in the court's opinion, warranted a higher sentence. In other words, the record indicates that the judge was influenced by the two aggravated battery and the aggravated assault convictions which are being vacated in imposing sentences for the other three offenses. We therefore remand this cause for resentencing on the armed violence (aggravated battery (peace officer)) (count VI), unlawful use of weapons (count VIII), and aggravated assault (deadly weapon) (count IX) offenses. See *People v. Mitchell* (1984), 105 Ill. 2d 1, 15-16, 473 N.E.2d 1270, 1277, *cert. de-*

*nied* (1985), 470 U.S. 1089, 85 L. Ed. 2d 153, 105 S. Ct. 1857; *People v. Alejos* (1983), 97 Ill. 2d 502, 513-14, 455 N.E.2d 48, 53; *People v. Payne* (1983), 98 Ill. 2d 45, 57, 456 N.E.2d 44, 50, *cert. denied* (1984), 465 U.S. 1036, 79 L. Ed. 2d 708, 104 S. Ct. 1310.

Because this cause is being remanded for resentencing, it is unnecessary to decide whether the sentence imposed was excessive. We do note, as pointed out by defendant, that the one-year sentences imposed for each of the Class A misdemeanors (*i.e.*, the two counts of aggravated assault and the count of unlawful use of weapons) were one day in excess of the 364-day maximum sentences for Class A misdemeanors. Ill. Rev. Stat. 1985, ch. 38, pars. 12—2(b), 24—1(b), 1005—8—3(a)(1); see *People v. Williams* (1976), 42 Ill. App. 3d 134, 138-39, 355 N.E.2d 597, 601; *People v. Nieto* (1974), 18 Ill. App. 3d 294, 296, 309 N.E.2d 730, 732, *rev'd in part on other grounds* (1975), 59 Ill. 2d 580, 322 N.E.2d 473.

We therefore affirm that part of the judgment of the circuit court of Lake County finding defendant guilty of armed violence (aggravated battery (peace officer)) (count VI), unlawful use of weapons (count VIII), and aggravated assault (deadly weapon) (count IX); vacate that part of the judgment finding defendant guilty of, and sentencing him for, aggravated battery (peace officer) (count V), aggravated battery (deadly weapon) (count VII), and aggravated assault (peace officer) (count X); and remand for resentencing.

Affirmed in part; vacated in part; and remanded.

WOODWARD, J., concurs.

JUSTICE REINHARD, dissenting in part:

I concur in the majority opinion except for that part of the decision remanding for resentencing. Where the record does not indicate that the circuit court was influenced by the vacated sentences in imposing sentences for the other offenses, a remand for resentencing is unnecessary. (*People v. Payne* (1983), 98 Ill. 2d 45, 57, 456 N.E.2d 44.) Here, in remarking on defense counsel's argument advanced at the hearing to reconsider defendant's sentence for armed violence that the jury found defendant not guilty of attempted murder, the circuit court merely responded that the jury did find defendant guilty of armed violence and other offenses. This one, isolated comment in the record does not suggest, in my opinion, that defendant's sentence for armed violence was improperly affected by the convictions now vacated in this court. A reviewing court should not focus on a few

words of the trial court, but should consider the entire record as a whole to determine if the sentence was improper. See *People v. Ward* (1986), 113 Ill. 2d 516, 526-27, 499 N.E.2d 422.

From my reading of the record, the original sentence imposed for armed violence, which was reduced by the court at the hearing to modify the sentence, was based entirely on factors related to that offense and was not influenced by the number of convictions. (See *People v. Burke* (1987), 164 Ill. App. 3d 468, 474-75, 517 N.E.2d 1191.) There is simply no indication that the circuit court was influenced by the lesser convictions, briefly referred to in the hearing to modify, in imposing sentence for the more serious offense of armed violence. (See *People v. Haybron* (1987), 153 Ill. App. 3d 906, 909, 506 N.E.2d 369.) The 12-year sentence imposed for armed violence was substantially less than the maximum statutory sentence. Moreover, the majority *sua sponte* remands for resentencing the convictions for unlawful use of weapons and aggravated assault which had not been requested by the defendant in either the circuit court or this court. Remandment for resentencing on this record serves no useful purpose.

Finally, I do not share the majority's viewpoint that the *Payne* and *Mitchell* decisions of our supreme court are inconsistent. *Payne* clearly sets forth the rule that where the record does not indicate that the trial court was influenced by another conviction, subsequently vacated, in imposing sentences for other offenses, a remand for resentencing is unnecessary. (*Payne*, 98 Ill. 2d at 57, 456 N.E.2d at 50.) *Mitchell*, on the other hand, is an application of the exception to that rule where, in the circumstances of that case, convictions for the *more serious* offenses were reversed and the record indicated that the trial judge imposed maximum extended-term sentences for the less serious offenses based upon exceptionally brutal or heinous behavior. (*Mitchell*, 105 Ill. 2d at 15-16, 473 N.E.2d at 1277.) The court apparently concluded from the record that the trial judge was influenced by the more serious convictions in imposing sentence for the less serious offenses. However, just because a more serious conviction is vacated, that alone, without an indication in the record of influence on the remaining convictions, will not require a remand for resentencing. See, e.g., *Payne*, 98 Ill. 2d at 57, 456 N.E.2d at 50 (where codefendant Bailey's conviction for Class X offense of armed violence vacated and no remand for resentencing for same Class X offense of armed robbery and lesser Class 2 felony offense of burglary).