THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TERELIUS MOCABY, JR., Defendant-Appellant.

Fifth District No. 5—88—0399

Opinion filed February 9, 1990.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Charles Garnati, State's Attorney, of Marion (Kenneth R. Boyle, Stephen E. Norris, and Debra A. Buchman, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Defendant, Terelius Mocaby, Jr., appeals his convictions and sentence for murder following a jury trial in the circuit court of Williamson County, held February 23 through 26 and February 29, 1988. He raises five issues on appeal: (1) whether the State proved beyond a reasonable doubt that defendant was not so intoxicated that he was incapable of forming the necessary intent for murder; (2) whether defendant was denied a fair trial where the trial court refused his tendered instructions on voluntary and involuntary manslaughter; (3) whether the trial court abused its discretion in allowing the jury, during deliberations, to listen to defendant's tape-recorded confession; (4) whether two of defendant's murder convictions must be vacated as all three murder convictions were carved from the same physical act; and (5) whether defendant is entitled to one additional day of credit against his 23-year sentence of imprisonment. We reverse defendant's convictions and sentence because we find that he was denied a fair trial by the trial court's refusal to instruct the jury on the offense of voluntary manslaughter.

Defendant was charged with three counts of murder involving the stabbing death of his adult son, Ryan Mocaby. The stabbing occurred May 22, 1987, at a private fishing pond where defendant and his family were spending the day fishing and picnicking. The evening before the stabbing, defendant and the victim went to the pond to fish and spend the night. On the way to the pond, they stopped at a liquor store and purchased a case of beer. Both defendant and the victim consumed beer that evening and into the morning hours. At some point during the evening the defendant, the victim and another man who had joined them for a few hours went to a liquor store where they purchased two more cases of beer.

The next morning, defendant and the victim awoke at approximately 8 a.m. and began fishing. They drank beer while they fished and throughout the day. At approximately 10:30 a.m., the rest of defendant's family arrived and defendant and the victim stopped fishing and went up to the picnic area.

While fishing that morning, the victim had caught a large bass of

which he was very proud. He had put the bass on a stringer in the pond, and during the course of the morning, showed it to various members of his family. However, when he took a friend down to view the fish, the victim discovered that it was no longer on the stringer, but had somehow escaped. The victim became very upset and began to blame his younger brother, Mark, for letting the fish escape. During the rest of the morning and early afternoon, the victim continued to complain about losing his fish. Finally, the victim became so upset that he threw a beer can at Mark, hitting him in the face and leaving a mark. The victim also hit Mark in the back of the head. At that point the victim's sister, Anita, stepped in and told the victim to stop. The victim then began pushing and shoving Anita.

The evidence is conflicting as to exactly what happened next. Mark testified that while the victim "had a hold" of Anita, the defendant got up from where he had been sitting cleaning fish, approached the victim, grabbed him by the shoulder and turned him around. Although Mark did not see the knife in the defendant's hand, he did see the defendant swing his arm toward the victim's chest. Mark testified that he saw the defendant stab the victim. The victim then kicked the defendant in the chest and began to walk down the hill toward the pond.

Anita testified that when she told the victim to stop fighting with Mark, the victim stopped hitting Mark and began shoving her. Anita began to cry and sat down. The victim then started to walk away toward the pond. Defendant was sitting by a tree. Anita did not see the stabbing, but heard someone say, "He's been stabbed." She then saw defendant standing, and she thought she saw the victim kick the defendant and then stumble down the hill toward the pond.

Shirley Mocaby, the defendant's wife and the victim's mother, testified that she saw the victim slap Anita's face, bloodying her mouth. She admitted that she had not mentioned this to the police after the stabbing. Shirley did not see the stabbing.

The victim collapsed part-way down the hill. The defendant helped to load the victim into the back seat of an automobile and sat in the back seat with him while another family member drove to the hospital. The defendant testified that on the way to the hospital he attempted to give the victim mouth-to-mouth resuscitation. The defendant thought that the victim expired on the way to the hospital and told the driver of the vehicle that he could slow down as it was "too late." The victim was pronounced dead at the hospital.

Defendant testified at trial that he had been drinking the night before and the day of the stabbing. He remembered the victim becom-

ing upset over the loss of his fish and blaming Mark. He did not see the victim hit Mark or throw a beer can at Mark. He did remember the victim and Mark arguing. Defendant was sitting in a lawn chair near the fire. The victim was arguing with family members, and it was becoming quite loud. The victim shoved Anita, and defendant thought Anita "was in trouble, so I thought I've got to break it up or help Anita, go to [Anita's] assistance." Defendant remembered getting up from where he was sitting to help Anita. The next thing defendant remembered was the victim holding himself and defendant holding the knife. The victim turned and walked down the hill toward the pond. Defendant testified that he was in a stupor. He remembered loading the victim into the car and driving to the hospital. The victim had his head on defendant's lap and, although he was still breathing, seemed to be getting weaker. Defendant attempted to give the victim mouth-to-mouth resuscitation. Defendant remembered being told by the doctor that the victim was dead and remembered giving a tape-recorded statement to Sheriff's Deputy Robert McCluskey.

Defendant admitted that he had no reason or desire to kill the victim that day and that he did not remember intending to hurt or kill the victim. He testified that at the time the victim and Anita were arguing, he felt that he had to defend Anita because he saw that she was getting shoved and pushed. Defendant did not remember arguing with the victim or being threatened by the victim that day.

Defendant was arrested at the hospital and transported to the sheriff's department. While there he made a statement to Deputy McCluskey. McCluskey testified that he could smell alcohol on defendant's breath and it was clear defendant had been drinking. However, defendant could walk, was alert and appeared to understand what was being said. Defendant stated that the victim was shoving various family members, including defendant's wife. Defendant was tired of Mark being blamed for the lost fish and wanted it to stop. Defendant stated that he did not remember the actual stabbing, but "remembered that he felt that [the victim] was holding someone" and he got up and went over to them. Defendant admitted stabbing the victim, that it was not an accident and that the victim had not threatened or attacked him that day.

Defendant gave Deputy McCluskey a tape-recorded statement which was admitted into evidence and played at defendant's trial. In that statement, defendant stated that the victim would not stop arguing about his lost fish. The victim finally got so mad that he started shoving people around, including Anita and defendant's wife. Defendant was sitting in a lawn chair. He vaguely remembered stabbing the

victim and admitted that he did stab the victim. He identified the knife. He did not mention that he felt the need to defend or help Anita in any way. He stated, "I thought, 'I'm not taking—(unintelligible)' It wouldn't have done no good for me to have tried to fight him, that boy. He was a big boy. He told me, 'I'll break your God-damn neck.' " He stated that he remembered being mad at the victim when the victim started shoving people around. The recorded statement was consistent with the unrecorded statement defendant gave to Deputy McCluskey.

With respect to defendant's intoxication, defendant testified that he did not remember how many beers he had drunk at the time of the stabbing, but was sure that as long as there was beer to drink, he would drink it. Defendant testified that he had been drinking alcohol since he was 17 years old and that he had been fired from two jobs because of his drinking. At the time of the stabbing, defendant's paycheck was sent directly to his home so that he would not spend it all on alcohol. Defendant's wife gave him $20 per week to spend on alcohol.

Anita characterized her father as drunk at the time of the stabbing, although she testified that he was still able to walk and talk. She testified that her father drank to excess and would drink through every weekend.

Shirley also thought defendant was drunk at the time of the stabbing and testified that he staggered when he stood. Shirley confirmed that defendant had a drinking problem and that he was drunk every weekend. When defendant was drunk, he acted differently than when he was sober and often could not remember things he had done while drunk. Defendant had received treatment in the past for alcoholism.

Rory Miskelly, defendant's son-in-law, testified that defendant was intoxicated before the stabbing and was having some trouble getting around. Defendant was able to walk and talk at the hospital, and provided hospital personnel with information regarding the victim and the stabbing.

Defendant talked with several police officers at the hospital. Defendant admitted that he had stabbed the victim and identified the knife. Defendant told a police officer that the victim was mad about his fish which had escaped, that he was shoving and threatening his family, and that the defendant just couldn't take it any more and stabbed the victim. Defendant stated that he had been taunted for years by the victim and could not take any more. The victim did not attack defendant the day of the stabbing. At the hospital, defendant was able to walk without staggering. However, police officers testified

that there was a strong odor of alcohol on defendant, that his speech was slightly slurred and he appeared to be intoxicated. Defendant was able to provide hospital personnel with information regarding the victim.

Dr. David Warshauer, a psychologist, testified as an expert witness as to defendant's alcoholism. He testified that defendant is a chronic alcoholic who had sought treatment in the past. Dr. Warshauer testified that an alcoholic would not necessarily stagger or be unable to speak when drunk. An alcoholic might act quite normal, but his thinking could be "completely awry." Dr. Warshauer explained that alcoholics often have periods of blackout and that he thought defendant had had at least two blackouts on the day of the stabbing. During a blackout, a person may appear normal but have a loss of memory.

At the jury instruction conference, defendant tendered instructions on voluntary manslaughter and involuntary manslaughter. They were objected to by the State and refused by the trial court.

During the jury's deliberations, the jury sent out a note asking for a tape recorder so that they could hear the tape of defendant's statement made to Deputy McCluskey. The State had no objection. Defendant did not expressly object at the time because the matters of admitting the tape recording into evidence and allowing the jury to rehear the taped confession had been discussed earlier in the proceedings, and defendant's objections had been overruled at that time.

The jury returned a verdict of guilty of murder on all three counts. The trial court entered judgment on all three counts and, after hearing a post-trial motion and conducting a sentencing hearing, sentenced defendant to 23 years' imprisonment on each count, to run concurrently.

■■ ■ The first issue raised on appeal is whether the defendant was proved guilty of murder beyond a reasonable doubt where he presented evidence of his intoxication at the time of the killing. Intoxication may be a defense to a crime which requires a specific intent, such as murder, where the intoxication is so extreme as to suspend all reason and make it impossible for the defendant to form the necessary intent. (*People v. Brown* (1980), 89 Ill. App. 3d 852, 857, 412 N.E.2d 580, 584.) The defense of intoxication is an affirmative defense which must be raised by the defense. Once raised, however, the State bears the burden of proving beyond a reasonable doubt that defendant was not so intoxicated that he was incapable of forming the necessary intent. (*People v. Evrard* (1965), 55 Ill. App. 2d 270, 273, 204 N.E.2d 777, 779.) Defendant argues that the State did not meet this burden

in the instant case. We disagree.

■ Mere alcoholism does not constitute a defense to a crime, nor does mere intoxication. (*People v. Hurt* (1988), 175 Ill. App. 3d 970, 977, 530 N.E.2d 698, 703.) There are many levels of intoxication through which an individual may pass before reaching the level which constitutes a defense to a criminal charge. (*Hurt*, 175 Ill. App. 3d at 977, 530 N.E.2d at 703.) Thus, the mere fact that defendant had been drinking and was probably to some degree intoxicated at the time of the stabbing does not require reversal of the jury's verdict. In order to constitute a defense to a criminal charge, the intoxication must be so extreme that it suspends entirely the power of reason or renders the defendant wholly incapable of forming the requisite intent to commit the crime in question. *Hurt*, 175 Ill. App. 3d at 977, 530 N.E.2d at 703.

In the instant case, the evidence demonstrates that, although defendant did not remember the act of stabbing the victim, he did recall in substantial detail the events leading up to and following the stabbing. Furthermore, there was evidence that his failure to remember the stabbing may have been due to his unconscious repression of a traumatic event. Defendant was certainly lucid after the stabbing and, according to his own testimony, was thinking rationally before the stabbing. (He testified that he thought he needed to defend Anita from the victim's attack and got up to do so.)

■ The question of whether defendant was so intoxicated as to be unable to perform a knowing or intentional act is for the jury. (*People v. Quinn* (1977), 46 Ill. App. 3d 579, 583, 360 N.E.2d 1221, 1224.) The jury in the instant case believed that defendant's intoxication was not so extreme as to suspend his power of reason or render him incapable of forming the requisite intent to commit the murder. That finding is not so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (See *People v. Watts* (1988), 170 Ill. App. 3d 815, 824, 525 N.E.2d 233, 240.) Despite this conclusion, we must still address defendant's other claims of error, for if defendant's trial was unfair or deprived him of substantial justice, he is entitled to reversal of his conviction and a new trial.

■ ■ The next issue raised by defendant is whether the trial court erred in refusing to instruct the jury on the offenses of voluntary and involuntary manslaughter. It is well settled that if there is evidence in the record which, if believed by a jury, would reduce the crime to manslaughter, a manslaughter instruction tendered by defendant must be given. (*People v. Leonard* (1980), 83 Ill. 2d 411, 420-21, 415 N.E.2d 358, 363.) Instructions will not be justified that

are based on the merest factual reference or witness' comment, but even a slight amount of evidence will raise the issue and justify the instruction. (*People v. Robinson* (1987), 163 Ill. App. 3d 754, 761, 516 N.E.2d 1292, 1298.) However, a manslaughter instruction should not be given where the evidence clearly demonstrates that the crime was murder and there is no evidence to support a manslaughter conviction. *People v. Riddle* (1988), 175 Ill. App. 3d 85, 89, 529 N.E.2d 713, 716.

 █ An individual commits voluntary manslaughter when he intentionally or knowingly kills another while acting under an unreasonable belief that deadly force is necessary to protect himself or another from imminent death or great bodily harm. (*People v. Jordan* (1985), 130 Ill. App. 3d 810, 812, 474 N.E.2d 1283, 1286.) In the instant case, the evidence shows that immediately before the stabbing, the victim had been arguing with and hitting various members of defendant's family. The defendant testified that he felt the need to defend or help Anita because the victim was pushing and shoving her. The defendant told Deputy McCluskey that the victim was a big person, that defendant could not fight the victim and that on previous occasions, the victim had threatened to break the defendant's neck. Furthermore, defendant was intoxicated at the time of the stabbing. Intoxication may contribute to a defendant's mistaken belief of self-defense. *People v. Smith* (1984), 124 Ill. App. 3d 720, 723, 464 N.E.2d 824, 827.

 We think this evidence was sufficient to raise the question whether defendant stabbed the victim under the unreasonable belief that deadly force was necessary to protect Anita and himself from death or great bodily harm and to justify the giving of defendant's tendered voluntary manslaughter instruction. The trial court erred in failing to do so. We further find the error to be reversible. If the jury had believed the defendant's testimony in this respect and been properly instructed, it could have reasonably returned a verdict of guilty of voluntary manslaughter rather than murder. Defendant was therefore prejudiced by the trial court's refusal to instruct the jury on voluntary manslaughter. See *People v. Peery* (1973), 11 Ill. App. 3d 730, 734, 297 N.E.2d 643, 646.

 █ We reach a different conclusion with respect to the trial court's refusal to instruct the jury on the offense of involuntary manslaughter. The crime of involuntary manslaughter occurs where death results from acts performed recklessly, but without the intent to injure. (*People v. Platter* (1980), 89 Ill. App. 3d 803, 821, 412 N.E.2d 181, 194.) Where the evidence demonstrates that the defendant acted with the intent to kill or injure the victim, an involuntary manslaugh-

ter instruction is not warranted. A person acts intentionally when his conscious objective or purpose is to accomplish the result or engage in the conduct. (Ill. Rev. Stat. 1987, ch. 38, par. 4—4.) A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. Ill. Rev. Stat. 1987, ch. 38, par. 4—6.

In the instant case, all the evidence indicates that defendant acted intentionally in stabbing the victim. There is no evidence that the stabbing occurred during the course of a struggle between the defendant and the victim or that the stabbing occurred accidentally when defendant recklessly approached the victim brandishing a weapon. Instead, Mark testified that the defendant approached the victim from behind, grabbed him by the shoulder to turn him around, and swung his arm toward the victim's chest in a stabbing motion.

 There must be some evidence in the record that the defendant did not intend to injure or kill the victim when he stabbed him, but that the stabbing occurred only through the defendant's recklessness in approaching the victim while holding a knife. There is no such evidence in the record. The trial court did not err in refusing to instruct the jury on the offense of involuntary manslaughter. See *People v. Wolski* (1980), 83 Ill. App. 3d 17, 25-26, 403 N.E.2d 528, 536, *cert. denied* (1981), 450 U.S. 915, 67 L. Ed. 2d 339, 101 S. Ct. 1356.

In his brief, defendant relies on *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497. In *Jenkins*, the defendant was chasing his wife with a knife when he encountered his wife's boyfriend on the stairway. A struggle ensued between defendant and the boyfriend during which the boyfriend was fatally stabbed. Defendant did not remember the stabbing and there were no other witnesses. Defendant's tendered involuntary manslaughter instruction was refused, requiring reversal of defendant's murder conviction. We think *Jenkins* is distinguishable from the instant case. In *Jenkins*, there was no evidence of an intentional stabbing and the stabbing occurred during the course of a struggle between the defendant and the victim. Under that set of facts, it is conceivable that the stabbing was not intentional and that it occurred accidentally during the struggle. However, in the instant case, the evidence indicates that there was no struggle between the defendant and the victim and that the defendant stabbed the victim purposefully and intentionally. We do not think an involuntary manslaughter instruction was warranted in the instant case.

In light of our reversal of defendant's convictions for failure to in-

struct the jury on the offense of voluntary manslaughter and the remand of this cause for new trial, we find it unnecessary to discuss the defendant's remaining issues.

For the foregoing reasons, the judgment of the circuit court of Williamson County is reversed and this cause is remanded for a new trial.

Reversed and remanded.

HARRISON and GOLDENHERSH, JJ., concur.