THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL
REDMOND, Defendant-Appellant.

First District (1st Division)   No. 1—92—0400

Opinion filed June 20, 1994.

Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Tamara Loury, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a bench trial, defendant Carl Redmond was found guilty of first-degree murder. The trial judge sentenced defendant to 35 years in the Illinois Department of Corrections. On appeal, defendant contends: (1) that the State failed to present sufficient evidence to rebut his intoxication defense and, therefore, did not prove beyond a reasonable doubt that he possessed the requisite mental state for first-degree murder; (2) that he was prejudiced when the trial judge refused to appoint him standby counsel during the hearing on his post-trial motions because the judge erroneously believed she did not have the discretion to appoint standby counsel; (3) that his 35-year sentence was excessive because the judge failed to give adequate consideration to his rehabilitative potential and to the fact that his conduct was caused by PCP intoxication; (4) that his conviction must be reversed because the State suppressed evidence and relied upon perjured testimony and his court-appointed counsel cooperated in this "fraud"; and (5) that the order of sentence reflects two convictions for first-degree murder where there was only one death and, therefore, his sentence must be vacated and remanded for resentencing because the trial judge improperly considered both convictions in fashioning a sentence or, at the least, the order of sentence must be amended to reflect only one conviction.

On November 3, 1988, defendant shot and killed the victim, Deborah Austin. He was arrested and charged by indictment with two counts of first-degree murder, attempted first-degree murder, armed violence and unlawful restraint. Prior to trial, the State nol-prossed the armed violence charge. Defendant then waived his right to a jury trial and was tried on the murder, attempted murder, and unlawful restraint charges by the court.

Esther Crawford, the victim's mother, testified that defendant had been living with the victim and her eight-year-old daughter for approximately six months, but had moved out just prior to the killing because the victim's boy friend was coming to visit. According to Crawford, defendant subsequently moved some of his belongings back into the victim's apartment, but she did not believe he was living there on a day-to-day basis. She stated that, after defendant killed the victim, she began receiving phone calls from defendant. Defendant explained to her how the shooting happened, but told her he did not know why he had killed the victim. Crawford testified that defendant never told her that he had heard the voice of his army drill sergeant telling him to shoot the victim.

Vera Johnson, the registration clerk with the City of Evanston Recreation Department, testified that her working area at the Evans-

ton Civic Center faces the front of the lobby. She testified that, on November 3, 1988, at approximately 11 a.m., she saw the victim in the civic center lobby arguing with a black male. The victim appeared agitated, but the man was calm and kept his hands in his pockets the entire time. At some point during the argument, a co-worker told the victim that she had some mail. As the victim returned to her office, the man asked the victim if he could come with her to her office. According to Johnson, the victim said, "No, I'm through talking to you. I have nothing else to say." The victim then went inside her office and the man walked down the hall. Johnson then saw him return and stop at a water fountain. Subsequently, however, while Johnson was waiting on a customer, she noticed the man walk quickly past her toward the victim's office. Approximately five minutes later, she heard the victim scream for Elaine Ferris and heard the victim say, "No, no, please don't." She then heard a gunshot.

Elaine Ferris, the secretary to the superintendent of the recreation department, testified that she saw a black male follow the victim into her office at approximately 12 noon on November 3, 1988. She stated that the door closed behind the man and she heard voices raised in argument. She then heard the victim scream her name several times. When she went to the door of the victim's office, however, she could not get it open because someone was holding it shut. Ferris testified that she heard the victim say "No, don't" and then heard a gunshot. According to Ferris, after the gunshot, Superintendent Jean Ann Schultz ran to the door and unsuccessfully attempted to open it. Schultz then asked the man in the office if he would let her in so she could help the victim, but he refused. Schultz continued to ask calmly for permission to enter to help the victim and eventually the man allowed her into the office. When the door opened, Ferris observed the victim on the floor with a hole in her chest. Ferris then called the police.

Lieutenant Daniel Mangas of the Evanston police testified that, on November 3, 1988, when he arrived at the scene, he stationed officers strategically around the office. Through an office window, he saw Schultz leaning over the body of the victim and he saw defendant standing with his back against the door. Mangas stated that he told defendant to put down his gun. Defendant lowered his gun and, eventually, placed it on a desk top. Mangas then kicked the door open, which caused defendant to be propelled across the room toward the gun. According to Mangas, defendant picked up the gun and spun to his left. Mangas grabbed defendant's wrist and they struggled while another officer pulled Schultz out of the office. During the struggle the gun discharged, and a metal object subsequently was

discovered embedded in a picture across from the victim's office. Mangas finally gained control of defendant and placed him in custody.

Sergeant Page testified that, after defendant's arrest, he and several other officers escorted defendant to a marked squad car and placed defendant in the back seat. Page stated that he advised defendant of his *Miranda* rights and asked him if he understood them. According to Page, defendant responded "yes." Defendant then gave Page his name, its spelling, and his date of birth in response to several more of Page's preliminary questions. In response to further questioning, defendant told Page that he was living with the victim and that he had shot the victim once in the heart because "he had given her several chances and today was the last chance." Defendant also told Page that he was on drugs and that he had drugs in his jacket pocket. Page then pulled seven foil packets out of defendant's jacket. He did not open the packets at that time. According to Page, defendant did not seem to have any difficulty understanding his questions and defendant's answers were responsive.

Detective John Woodward testified that, on November 3, 1988, at approximately 12:24 p.m., he spoke with defendant at the police station after defendant signed a waiver of rights form. Defendant told him that he and the victim had been dating since April 1988, and that he moved in with her and her daughter in July 1988. According to Woodward, defendant said that he had been asked to leave in September 1988 because the victim's boy friend was coming to visit and needed a place to stay. Defendant said that it was at this point when all his problems started. Defendant was arrested by the Skokie police for driving under the influence of alcohol and criminal damage to property. Shortly thereafter, the Chicago police arrested him on a drug charge, but he was released approximately two weeks before the shooting. The victim then allowed him to move back in with her. Woodward testified that defendant asserted that, during that two-week period, defendant and the victim argued frequently about her desire to see other men.

Woodward stated that defendant told him that, on the morning of November 3, 1988, the victim had asked defendant to move out again. They argued all morning and defendant removed the victim's gun from her closet when she left to take her daughter to school. When she returned, the argument continued and defendant threatened the victim with the gun. The victim called for a neighbor to call the police, but as far as defendant was aware the police were never called. He then walked with her to her office. On the way, he gave the gun to the victim. A police squad car drove by and the victim

placed the gun in her coat. After the squad passed, defendant took the gun from the victim and placed it in his coat. At the victim's office their argument continued.

Defendant told Woodward that, at the office, he "lost it," removed the gun from his pocket, pointed it at the victim's chest and pulled the trigger. After the victim collapsed on the floor, he lit a cigarette which he was smoking when he heard a woman knock on the door. She refused to go away so he let her into the office. When the police arrived, they forced their way into the room. Defendant wrestled with an officer and the gun went off. According to Woodward, defendant stated that he loved the victim and could not stand the idea of her making love to another man.

Woodward also testified that defendant indicated to him that he had a drug problem and that he had gone to the Veteran's Administration Hospital (VA) for treatment. He asserted that it was his drug problem which caused him to be fired from his job. Defendant did not indicate to Woodward that he was contemplating suicide. Defendant also did not tell Woodward that he had been in a "trance" at the time of the shooting or that he had heard the voice of his drill sergeant instructing him to carry out his actions.

The parties then entered into a number of stipulations. It was stipulated that if Dr. Eupil Choi, an assistant Cook County forensic pathologist, were called to testify, he would state that he performed an autopsy on the victim on November 4, 1988, and that, in his expert opinion, the victim died of a gunshot wound to the chest. It was further stipulated that the seven foil packets recovered from defendant were inventoried and tested and that three of the packets contained cannabis (marijuana) and phencyclidine (PCP) and the other four packets only contained marijuana. It was stipulated that a cigarette found on the office floor was inventoried but not analyzed.

It was also stipulated that defendant appeared in court on the morning of November 4, 1988, was then transported to the Cook County jail, and spent the night in the "bullpen" without assignment. On November 5, 1988, defendant was assigned to the residential treatment unit (RTU), the psychiatric ward, because of "suicidal ideation." He was diagnosed as having a psychoactive substance abuse problem. On November 6, 1988, the RTU determined that defendant was no longer a suicide risk and released him into the general population.

The parties also stipulated that if George Moore, a psychiatric social worker with the VA, were called to testify, he would state that he interviewed defendant on November 1, 1988, two days prior to the shooting, when defendant applied for admission to the VA's drug

treatment program. Defendant told Moore that he had a problem with PCP and alcohol. It was Moore's impression that defendant was under the influence during the interview. Defendant told Moore that he had been smoking PCP for four months and that he was currently smoking eight joints a day. Defendant reported to Moore that he had a history of alcohol dependence and episodes of alcoholic amnesia. Moore recommended defendant for outpatient treatment and ruled out personality disorders or adult antisocial behavior as the cause of defendant's reported problems. Moore would testify that he did not observe any signs of hallucinations, delusions, suicidal tendencies, or homicidal tendencies in defendant and that defendant did not report any of these to him. Had he seen signs of these traits, Moore would have recommended inpatient treatment. Defendant appeared too late in the day, however, to be screened for admission and Moore told him to return for an 8 a.m. appointment the following morning. It was further stipulated that the urine sample defendant provided on November 2, 1988, tested positive for PCP.

Defendant then presented the testimony of Judy Grund, an employee at Lens Crafter's in Skokie, Illinois. Grund testified that, on September 24, 1988, at approximately 2 p.m., defendant came into the store demanding his contact lenses. He was hostile and slurring his words and Grund thought he was "on something." The police were called and defendant was arrested. Grund stated that she had seen defendant in the store on other occasions in August and September and defendant had been polite. According to Grund, approximately one week after the incident, defendant's attorney called her to tell her of defendant's drug and alcohol problem. She also received a phone call from defendant telling her that he had a drug and alcohol problem, that he was high on drugs on September 24, 1988, and that he would be seeking help.

Beatrice Delaney, defendant's aunt, testified that defendant came over to her house in October 1988, with his niece and nephew. While sitting on the porch, defendant told her about his car and that he was going to train his nieces for track. According to Delany, his mood then changed dramatically and he became depressed. He wondered why he was allowed to watch the kids because he was out of control and did not know what he was doing.

James Redmond, defendant's brother, testified that he went on a drive with defendant in September 1988. He described defendant at that time as "hyper." He stated that he had seen defendant act hyper on prior occasions and defendant told him that his behavior was the result of PCP use. Subsequently, on a Saturday, Redmond stated that he received a call from defendant during which defendant seemed confused and asked him what day it was.

Yolanda Redmond, defendant's first cousin, testified that she saw defendant every weekend between August and October 1988. She stated that on a Saturday evening in the middle of September, she went on a drive with defendant in his new car. At the time, Yolanda was eight months pregnant. She stated that defendant was very happy. During the ride, defendant said to her, "don't say nothing if I feel on you." According to Yolanda, she told defendant to let her out of the car and defendant then began to cry and apologize. Yolanda testified that she had seen defendant acting hostile and threatening on prior occasions, but she attributed his behavior mostly to his drug problem. She stated, however, that she had never seen defendant drinking alcohol and she had known defendant her entire life.

Defendant then presented the testimony of Dr. Amin Daghestani, a physician and psychiatrist who was board certified in psychiatry and addictive medicine. Dr. Daghestani was the primary author of a chapter in a 1989 American Psychiatric Association textbook titled "Phencyclidine Abuse and Defense." He stated that PCP is an animal tranquilizer and a psychoactive substance. He asserted that the wide range of sympathomimetic effects from PCP use are a rise in blood pressure, rise in heart rate, rise in the respiratory rate, and sweating and dizziness. He stated that PCP is both a mood and mind altering drug.

According to Daghestani's testimony, abuse of PCP is a less severe condition than dependence where the use of the drug will impact on the person's social, occupational, physical, and psychological functions. He stated that characteristics of PCP dependence are hostility, fighting, loss of friends, legal difficulties, belligerence, assaultiveness, impulsiveness, unpredictability, agitation, impaired judgment, muscle rigidity, hallucinations, weight loss, paranoid and suicide ideation, violent and bizarre behavior, and confusion. He asserted that it is common for a PCP-intoxicated person to lose contact with reality and that such an episode is described as a "trance" or hallucination. A "trance" can last a few minutes or longer. He said that a person who is experiencing a blackout or hallucination may realize that what he or she is seeing is not real, but would be unable to describe what really occurred. Symptoms from PCP use can manifest themselves for days or weeks after the person has ingested the drug and the manifestation of these symptoms is erratic. There also can be "flashbacks" or the reexperience of symptoms. Daghestani stated that the ingestion of the substance by a dependent person is not voluntary because the person loses control over the use of the substance.

In arriving at his conclusion about defendant's mental capacity

at the time of the shooting, Daghestani reviewed police reports, lab data, VA hospital reports, Dr. Matthew Marcus' report, and Dr. Kimberly Baker's report. He also met with defendant and his attorney at the Cook County jail for approximately $1^1/_2$ hours 21 months after the shooting incident.

At the interview, Daghestani learned that defendant had a significant substance abuse problem involving alcohol, marijuana and PCP and that days before the shooting he was using all three substances. Defendant told Daghestani that he woke up on November 3, 1988, feeling "strange." He went to the train because he had an appointment that morning at the VA substance abuse clinic. Defendant told Deghastani that he felt "dizzy" so he returned to the victim's apartment and asked the victim to drive him to the station. According to Daghestani, defendant said he was feeling paranoid and in a trance and having hallucinations.

Daghestani testified that defendant told him that while he was with the victim he could see her mouth moving, but could not understand her words. Defendant told Daghestani that "he did not know what was going on." According to Daghestani, defendant started hearing voices telling him to do things and that he heard the voice of his drill sergeant telling him to shoot. Defendant said he became confused when he saw the hole in his girl friend's chest. Defendant also told Daghestani that on the morning of the shooting he was experiencing suicidal ideations and was preoccupied with death. Daghestani admitted that the only evidence of hallucinations was defendant's statement to him during their interview. He also stated that he was aware that defendant had told Dr. Baker that he had hopes of being found temporarily insane, but Daghestani did not believe that this was defendant's goal in speaking with him.

In Daghestani's opinion, defendant's ability to reason was totally suspended at the time of the shooting and defendant most likely was unaware of the nature and consequences of his conduct. Daghestani opined that defendant was unaware that he was shooting the victim or anyone else. He asserted that defendant's actions resulted from the acute effects of PCP intoxication. According to Daghestani, defendant's ability to reason was entirely abandoned from the time he removed the victim's gun from her closet until the shooting. His ability to reason returned when he allowed people into the office, put down the gun, and fired during the struggle with police.

In rebuttal, the State presented the testimony of Dr. Matthew Marcus, a full-time psychiatrist with the Psychiatric Institute who had gained experience with problems of drug addiction in his work with Mt. Sinai Hospital. Marcus reviewed the same reports as Dagh-

estani and also interviewed defendant. Marcus agreed with Daghestani that defendant was dependent on marijuana and PCP. Marcus placed more emphasis, however, on the inconsistencies in defendant's different statements. Specifically, he noted that no report other than Daghestani's mentioned a trance or that defendant heard his drill sergeant tell him to shoot the victim. Additionally, he believed that, if defendant was PCP intoxicated at the time of the shooting, he would not have been able to give the police such a consistent and coherent report about the reality of the situation. Consequently, Marcus concluded that there was insufficient clinical evidence for him to say with a reasonable degree of medical certainty that defendant's ability to reason was substantially impaired at the time he shot the victim or that he was PCP intoxicated at that time. He stated that the information was sufficient, however, to support the opinion that defendant was not intoxicated on the day of the shooting.

At the conclusion of the evidence and after arguments, the trial judge found defendant not guilty of unlawful restraint and not guilty of attempted murder of Mangas. As to the first-degree murder charge, the trial judge stated that defendant had produced sufficient evidence of intoxication to have shifted the burden to the State to prove beyond a reasonable doubt that defendant was not so intoxicated that he was incapable of forming the requisite intent for first-degree murder. The judge concluded, however, that the State had met its burden based upon the testimony of Marcus, the witnesses who observed defendant's behavior before and after the shooting, and the police officers' testimony about defendant's demeanor and ability to recall and restate facts. Accordingly, the judge found defendant guilty of first-degree murder.

Defendant then raised the issue of his counsel's incompetence and the judge granted his request for new counsel to represent him on his post-trial motions. Thereafter, defendant indicated his desire to proceed *pro se* and, after admonishments, the judge granted his request. After holding a hearing on defendant's post-trial motions for a new trial, the trial judge denied defendant's motions. At the sentencing hearing, the judge sentenced defendant to 35 years in the penitentiary and indicated that the two counts of murder would merge into one sentence.

Defendant's first contention on appeal is that the State failed to present sufficient evidence to rebut his intoxication defense and, therefore, did not prove beyond a reasonable doubt that he possessed the requisite mental state for first-degree murder. The State, on the other hand, asserts that the evidence was sufficient to prove that defendant acted knowingly and intentionally when he shot and killed the victim.

●1 In order to be convicted of first-degree murder in Illinois, a defendant must have killed his victim with the intent to kill or do great bodily harm, the knowledge that his acts would cause death, or the knowledge that his acts would create a strong probability of death or great bodily harm. (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a)(1), (a)(2)(now 720 ILCS 5/9—1(a)(1), (a)(2) (West 1992)); *People v. Brady* (1985), 138 Ill. App. 3d 238, 241-42, 485 N.E.2d 1159, 1162.) As a general rule, voluntary intoxication is not a defense to a criminal charge. (*People v. Camp* (1990), 201 Ill. App. 3d 330, 334, 559 N.E.2d 26, 29.) Intoxication is an affirmative defense, however, if the intoxication is so extreme that it suspended the defendant's power of reason and he was unable to form the requisite intent (*Camp*, 201 Ill. App. 3d at 334-35, 559 N.E.2d at 29) or the intoxication was involuntary and deprived defendant "of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of [the] law." (Ill. Rev. Stat. 1991, ch. 38, pars. 6—3(a), (b) (now 720 ILCS 5/6—3(a), (b) (West 1992)).) The mere fact of intoxication is never a defense (*Camp*, 201 Ill. App. 3d at 335, 559 N.E.2d at 29) because "[t]here are many degrees of intoxication through which an individual may pass before reaching the level of intoxication" which will constitute a defense. *People v. Hurt* (1988), 175 Ill. App. 3d 970, 977, 530 N.E.2d 698, 703.

Once a defendant has sufficiently raised the defense of intoxication, as the trial court found defendant had here, the State then bears the burden of proving beyond a reasonable doubt that defendant was not so intoxicated that he had lost his power of reason and was unable to form the requisite mental state for the offense. (*People v. Mocaby* (1990), 194 Ill. App. 3d 441, 447, 551 N.E.2d 673, 677.) Whether defendant's intoxication was so extreme as to render him incapable of committing a knowing or intentional act is a question for the trier of fact. (*Mocaby*, 194 Ill. App. 3d at 448, 551 N.E.2d at 678.) The fact finder, however, is not required to accept a psychiatrist's conclusion with respect to the issue (*Hurt*, 175 Ill. App. 3d at 977, 530 N.E.2d at 703), and its judgment will not be reversed on appeal unless the finding is "so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." (*Mocaby*, 194 Ill. App. 3d at 448, 551 N.E.2d at 678.) Additionally, we must review the record in the light most favorable to the prosecution and must assume that the fact finder resolved all controverted facts and questions of testimonial credibility in favor of the State. (*People v. White* (1991), 209 Ill. App. 3d 844, 868, 567 N.E.2d 1368, 1382.) Based on the record, we cannot say that no rational trier of fact could have concluded that defendant was capable of forming the requisite mental state for first-degree murder.

It is true that the evidence established that defendant was dependent on PCP. Additionally, his conduct at the time of the offense could have supported a factual determination that he was intoxicated to the point of having lost touch with reality at the time of the shooting. This conclusion is further buttressed by Daghestani's testimony that in his opinion defendant was incapable of forming the requisite intent for murder at the time of the offense. It was for exactly this reason that the question became whether the State's evidence was sufficient to show beyond a reasonable doubt that defendant was capable of possessing the intent or knowledge required for first-degree murder.

However, the fact finder was not required to accept Daghestani's opinion (*Hurt*, 175 Ill. App. 3d at 977, 530 N.E.2d at 703), and the evidence also supported the inference that defendant was not so intoxicated that he had lost touch with reality. Marcus stated that he could not give his opinion as to whether defendant's ability to reason was substantially impaired because there was insufficient evidence upon which to base that conclusion. In fact, he stated that, based upon the information available, a reasonable psychiatrist could come to the conclusion that defendant was not even intoxicated on the day of the shooting. Additionally, even absent Marcus' testimony, a fact finder could reasonably reject Daghestani's conclusions in light of the other evidence in the case.

●2 Daghestani testified that it was his opinion that defendant had lost touch with reality from the time he removed the gun from the victim's closet until he shot the victim. A reasonable fact finder could reject this opinion in light of the fact that during this period defendant was cognizant of the fact that the victim took her daughter to school, was able to argue with the victim, and was aware of the fact that a squad car passed him and the victim as they walked, armed with a loaded gun, to the victim's job. Additionally, the fact finder could question this opinion in light of the fact that, after the shooting, defendant was able to give a coherent and consistent statement to the police and was able to tell the police the reason why he killed the victim. It is reasonable to conclude that, had defendant been intoxicated to the extent that he had lost touch with reality at the time of the shooting, he would have been unable to relate the events of the morning to the police and would have mentioned that he was in a trance and listening to the voice of his army drill sergeant. After resolving all controverted facts and testimonial credibility in favor of the prosecution, we must conclude that the State met its burden and the judge's determination, acting as the finder of fact, was not so improbable and unsatisfactory that it creates a reasonable doubt of defendant's guilt.

Defendant's second contention on appeal is that he was prejudiced when the trial judge refused to appoint standby counsel during the hearing on his post-trial motions because she erroneously believed that she did not have the discretion to appoint standby counsel. The State, on the other hand, maintains that the judge did not err because she was aware that she could appoint standby counsel, but concluded that such appointment would be inconsistent with defendant's decision to proceed *pro se.*

●3 A defendant in a criminal case has a constitutional right of self-representation. (*People v. Gibson* (1990), 136 Ill. 2d 362, 374, 556 N.E.2d 226, 231.) The Illinois Supreme Court has held that the trial judge has discretion to appoint standby counsel, however, notwithstanding a defendant's decision to proceed *pro se* and even over a defendant's objection. (*Gibson*, 136 Ill. 2d at 378, 556 N.E.2d at 232.) It has been held that the appointment of standby counsel in such a situation does not offend the defendant's right of self-representation. (*Gibson*, 136 Ill. 2d at 375, 556 N.E.2d at 231.) When a defendant decides to proceed *pro se,* his right to control his defense is not infringed upon if standby counsel merely assists him " 'in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown that he wishes to complete' " or helps " 'ensure the defendant's compliance with basic rules of courtroom protocol and procedure.' " (*Gibson*, 136 Ill. 2d at 378, 556 N.E.2d at 232, quoting *McKaskle v. Wiggins* (1984), 465 U.S. 168, 183, 79 L. Ed. 2d 122, 136, 104 S. Ct. 944, 953-54.) The right of self-representation, however, "does not carry with it a corresponding right to the assistance of a legal advisor; one choosing to represent himself must be prepared to do just that" (*Gibson*, 136 Ill. 2d at 383, 556 N.E.2d at 234-35), and the judge has "broad discretion" in deciding whether to appoint counsel to assist a *pro se* defendant in an advisory capacity. (*People v. Partee* (1987), 157 Ill. App. 3d 231, 247, 511 N.E.2d 1165, 1176.) Additionally, the Illinois Supreme Court has yet to hold that the trial judge's failure to exercise his discretion, without more, necessarily requires reversal. In *Gibson,* the court expressly refused to decide this question, but did state that the utility of such a rule of automatic reversal is "doubtful" because "if it could be determined that the refusal to appoint standby counsel would not have been an abuse of discretion, there would be no purpose now in remanding the cause for further proceedings solely on the ground that the trial judge failed to exercise his discretion." *Gibson,* 136 Ill. 2d at 380, 556 N.E.2d at 233.

In the present case, when the defendant informed the court that he desired to proceed *pro se,* the following exchange occurred:

"THE COURT: Mr. Redmond, sometimes when somebody represents themselves in a serious criminal case, the judge appoints what's called a stand-by lawyer, makes a lawyer basically be available for you to consult with. I will not do that because I think that's inconsistent with your decision to represent yourself. If you choose to represent yourself, you will be representing yourself. And there will not be a lawyer appointed to sit there and be available when you're interested in talking to him or her and not be your lawyer. Do you understand that?

DEFENDANT: Okay.

THE COURT: Perhaps maybe at the jail somebody said, well, the judge will give you a stand-by lawyer or maybe the public defender will sit with you or have somebody consult with you. Did anyone suggest that to you that that might happen, in the jail?

DEFENDANT: It had been suggested.

THE COURT: It isn't going to happen. It's not going to happen. I believe that case law is very clear that you do one or the other, either go *pro se* or let your lawyer speak for you. This in between stuff doesn't work and I believe that the present state of the law, it's one or the other, and that's what I'm going to do.

So, there will not be a lawyer sitting there available for you when you feel like it. It will be either a lawyer whose job it is to do whatever lawyers do and I'll hold that lawyer to the fire and make sure that that lawyer does what the lawyer is supposed to do, or you'll represent yourself. Do one or the other. Do you understand that?

DEFENDANT: Yes, your Honor.

THE COURT: Knowing and understanding that, do you still wish to represent yourself?

DEFENDANT: Yes, your Honor."

●4 In our opinion, the preceding excerpt from the record illustrates that the trial judge recognized that she had discretion to appoint standby counsel. Although this passage can support the conclusion that the judge then exercised that discretion and concluded that to appoint standby counsel would be inconsistent with defendant's decision to proceed *pro se*, we recognize that a strong argument can be made for the proposition that she simply refused to exercise her discretion. Even giving defendant the benefit of the doubt, however, and concluding that the trial judge erroneously refused to exercise her discretion, we must conclude that defendant was not prejudiced and her decision was not an abuse of discretion.

Defendant had the benefit of counsel throughout the trial. He only proceeded *pro se* at the hearing on his post-trial motions and at sentencing. He asserts that he was prejudiced because, at the hearing

on his post-trial motions, he elicited damaging evidence from his witnesses and, at sentencing, "his argument in mitigation was a rambling story of his drug problem, how the problem grew, and what occurred on the day of the offense."

•5 As stated above, when a defendant proceeds *pro se*, he controls the substance of his defense and, if appointed, standby counsel's duty is to assist in routine procedural matters and to explain courtroom protocol. (*Gibson*, 136 Ill. 2d at 378, 556 N.E.2d at 232.) The instances of prejudice defendant asserts he suffered all arose out of substantive and strategical decisions and were not the result of procedural obstacles he was unable to overcome. The decision of what witnesses to put on the stand is a substantive and strategic decision. We cannot say that the appointment of standby counsel would have guaranteed that these witnesses would have proffered favorable testimony. In fact, the unintended elicitation of harmful testimony from one's own witnesses is an everyday occurrence which even the most accomplished lawyers have experienced. In our opinion, defendant's argument, in effect, is that he was prejudiced because standby counsel was not available to assist him in his substantive presentation. Such an assertion is, as the trial judge stated, "inconsistent with [defendant's] decision to represent [himself]."

Defendant's third contention on appeal is that his 35-year sentence is excessive because the trial judge failed to give adequate consideration to his rehabilitative potential and to the fact that his conduct was caused by PCP intoxication. The State first asserts that, under *People v. Macke* (1992), 224 Ill. App. 3d 815, 587 N.E.2d 1113, defendant has waived this issue on appeal by failing to file a motion to reduce the sentence with the trial court. Alternatively, the State contends that the trial judge did not abuse her discretion because she carefully considered the evidence in aggravation and mitigation and the sentence was within statutory guidelines.

Recently, in *People v. Lewis* (1994), 158 Ill. 2d 386, the Illinois Supreme Court rejected the argument that sentencing challenges are waived if defendant fails to file a motion to reduce his sentence with the trial court before he brings an appeal. (See *People v. Turner* (1992), 233 Ill. App. 3d 449, 456, 599 N.E.2d 104, 109-10.) Accordingly, defendant has not waived this issue.

Sentencing decisions are matters of judicial discretion and, therefore, if within statutory limits, will not be disturbed on review unless the trial judge abused her discretion. (*People v. Banks* (1993), 241 Ill. App. 3d 966, 981, 609 N.E.2d 864, 874.) The reason we review a sentence under this standard is because after seeing the evidence and viewing the defendant, the trial judge is "in a better position to

determine the punishment to be imposed." (*Banks*, 241 Ill. App. 3d at 981, 609 N.E.2d at 874-75.) We will not substitute our judgment, therefore, for that of the trial court simply because we would have imposed a different punishment. *Banks*, 241 Ill. App. 3d at 981, 609 N.E.2d at 875.

The Illinois Constitution mandates that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, § 11; Ill. Rev. Stat. 1991, ch. 38, par. 1001—1—2 (now 730 ILCS 5/1—1—2 (West 1992)).) The Illinois legislature has determined that murder is an offense punishable by not less than 20 years' and not more than 60 years' imprisonment. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(1) (now 730 ILCS 5/5—8—1(a)(1) (West 1992)); *People v. Brown* (1993), 243 Ill. App. 3d 170, 176, 612 N.E.2d 14, 19.) "In determining a sentence within these limits, the trial judge must balance the interests of society in discouraging such antisocial behavior against the rehabilitative potential of the defendant." (*Banks*, 241 Ill. App. 3d at 982, 609 N.E.2d at 875.) The trial judge is not required, however, to detail precisely for the record the exact process by which she determined the penalty nor is she required to articulate her consideration of mitigating factors nor is she required to make an express finding that defendant lacked rehabilitative potential. (*People v. Boclair* (1992), 225 Ill. App. 3d 331, 335, 587 N.E.2d 1221, 1224.) The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors such as the lack of a prior record, and the statute does not mandate that the absence of aggravating factors requires the minimum sentence be imposed. (*People v. Moore* (1992), 229 Ill. App. 3d 66, 79, 593 N.E.2d 771, 780.) Additionally, when mitigating evidence is before the court, it is presumed that the judge considered the evidence, absent some indication, other than the sentence imposed, to the contrary. *People v. Canet* (1991), 218 Ill. App. 3d 855, 864, 578 N.E.2d 1146, 1152.

When imposing the sentence in this case, the trial judge stated:

"Based on all the evidence in this case, all the facts, all the circumstances, all those factors in aggravation and mitigation that have been argued, and all those factors in aggravation and mitigation in chapter 38, I hereby sentence you, Carl Redmond, to thirty-five years in the Illinois Department of Corrections."

●6 The trial judge stated that she considered all factors in aggravation and mitigation. She did not explicitly set forth her reasoning or the manner in which she weighed the factors, but she is not required to do so. Defendant proffers no evidence, other than the

sentence imposed, to indicate that the judge did not adequately consider the mitigating evidence, and after a review of the record, we can find none. Additionally, the sentence was well within the statutory requirements. Accordingly, we find that the trial judge did not abuse her discretion in sentencing defendant to 35 years' imprisonment.

Defendant's fourth contention on appeal is that his conviction must be reversed because the State suppressed evidence and relied upon perjured testimony and his court-appointed counsel cooperated in this "fraud." The State, on the other hand, asserts that it presented proper evidence at trial, the allegedly perjured testimony was genuine and factual, was presented in good faith and was corroborated during trial.

Defendant supports his "conspiracy" theory with the following facts. Officer Hollander's inventory report shows that two spent .22-caliber casings and one live round were found in the gun recovered from the floor of room 1111, the crime scene. Officer Linden made two inventory reports both indicating that they were prepared at 1202 hours. The first indicated that Linden recovered one .22-caliber slug and one partially smoked marijuana cigarette from the hospital. The other report indicated that she recovered one partially smoked marijuana cigarette, one .22-caliber slug, and a drawing of the crime scene from room 1111. Officer Whitehead made a supplemental evidence report which indicated that a metallic object was recovered from a picture frame outside of room 1111 at approximately 1730 hours. Defendant asserts that these inventory reports establish that "all bullet/slugs had already been recovered by the medical personnel at the hospital and the evidence technician, Officer Linden hours before the metal-like object in the frame was discovered." He contends, therefore, that Mangas offered knowingly perjured testimony when he stated that the bullet which was discharged during his struggle with defendant was recovered from the picture frame. He also insists that the prosecutor and defense counsel suppressed one of Linden's inventory reports "in order to present the fabricated metal-like object and picture frame recovered outside of Room 1111, in place of the slug recovered by Linden somewhere inside Room 1111." Defendant asserts that the police, the State, Mangas and his defense counsel conspired to present this false evidence because they wanted to present evidence of an attempted escape by fabricating an attempted murder of Mangas and by using the "metal-like object" recovered from the picture frame to show the direction of an alleged shot at Mangas. Although he was acquitted of attempted murder, defendant contends that he was prejudiced

because evidence of the attempted escape was used by the trial judge as evidence that he was capable of forming the requisite intent for first-degree murder.

In Illinois, a person commits perjury when "under oath or affirmation, in a proceeding or in any other matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true." (Ill. Rev. Stat. 1991, ch. 38, par. 32—2(a) (now 720 ILCS 5/32—2(a) (West 1992)).) The defendant has the burden of showing that the State knowingly used perjured testimony. (*People v. Trimble* (1991), 220 Ill. App. 3d 338, 346, 580 N.E.2d 1209, 1213.) Defendant must establish by clear, convincing and satisfactory evidence, not only that the testimony was false, but that the testimony was "*willfully* and *purposefully* falsely given." (Emphasis in original.) (*Trimble*, 220 Ill. App. 3d at 346, 580 N.E.2d at 1213.) Additionally, defendant must show that the false testimony was material to his guilt or innocence. *People v. Henderson* (1976), 36 Ill. App. 3d 355, 384, 344 N.E.2d 239, 261.

•7 After reviewing defendant's argument in light of the record, we find that defendant has failed to establish that Mangas committed perjury or that all the participants in the trial conspired against him. Whether or not the metal object recovered from the picture frame was a bullet does not change the fact that two bullets were fired from the gun. Thus, the evidence supports Mangas' testimony that there was a struggle. Even absent evidence of a struggle, there was sufficient evidence in the record to support the conclusion that defendant possessed the requisite mental state for first-degree murder.

Defendant's final contention on appeal is that his sentence must be vacated and remanded for resentencing because the trial judge improperly considered two convictions for murder when fashioning his sentence when there was only one death or, at the least, the order of sentence must be amended because it reflects two convictions and there was only one death.

•8 It cannot seriously be contested that, where only one person is murdered, there can be only one conviction. (*People v. Fields* (1990), 199 Ill. App. 3d 888, 902, 557 N.E.2d 629, 637.) In this case, the indictments charged that Carl Redmond (1) "without lawful justification intentionally and knowingly shot and killed Deborah Austin with a gun," and (2) "without lawful justification shot and killed Deborah Austin with a gun knowing that such shooting created a strong probability of death or great bodily harm." These indictments merely mimicked the language of subsections 9—1(a)(1)

and 9—1(a)(2) of the murder statute. The order of sentence indicates two convictions for murder. However, the trial judge wrote the word "merged" next to the second conviction with an arrow pointing up to the first conviction. In our opinion, this indicates that the trial judge did not intend to convict defendant of two counts of murder, but only one. However, the order of conviction is misleading and, therefore, we order that the sentencing order be amended to clearly reflect only one conviction.

We find nothing in the record, however, to indicate that the trial judge based her sentencing decision on two convictions. The trial judge in this case is experienced and this is not a situation where there is a question as to whether a single "attack" by defendant could support two convictions on two separate offenses. (See *People v. Williams* (1991), 215 Ill. App. 3d 800, 816, 576 N.E.2d 68, 77-78; *Henderson*, 36 Ill. App. 3d at 385-86, 344 N.E.2d at 262-63.) Accordingly, we believe that the record is clear that defendant's sentence was not predicated on two convictions for murder. We see no reason, therefore, to remand to the trial court for resentencing.

Accordingly, for the foregoing reasons, the judgment and sentence are affirmed. We also order that the order of sentence be amended to clearly reflect one and not two convictions for first-degree murder.

Affirmed with instructions.

CAMPBELL, P.J., and MANNING, J., concur.