2022 IL App (2d) 200727-U
Nos. 2-20-0727, 2-20-0728 cons.
Order filed July 19, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15-CF-2857 |
| | ) | |
| TEVIN CHRISTOR, | ) | Honorable |
| | ) | Patricia S. Fix, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Trial court did not err in determining that defendant violated a condition of his probation.   (2) The probation conditions requiring defendant to submit to suspicionless searches of his cell phone were not unconstitutional or unreasonable. (3) The trial court, in resentencing defendant, did not improperly punish him for his probation conduct or fail to consider relevant mitigating factors.  Affirmed.

¶ 2    Defendant, Tevin Christor, appeals from the trial court's judgment, revoking his probation for unlawful possession of cannabis with intent to deliver more than 2000 but less than 5000 grams (720 ILCS 550/5(f) (West 2020)) (case No. 17-CF-2849) and unlawful restraint (720 ILCS 5/10-3 (West 2020)) (case No. 15-CF-2857) and sentencing him to 8½ years' and 3 years'

imprisonment, respectively. Defendant argues that (1) the trial court erred in determining that he violated his probation by failing to give a surveillance officer immediate access to his cell phone; (2) the suspicionless cell phone search conditions in his probation agreement were unreasonable and violated his constitutional rights; and (3) the trial court erred in sentencing him by improperly punishing him for his conduct while on probation and by failing to give adequate consideration to proper factors. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In case No. 15-CF-2857, defendant was charged with two class X counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2014)) and two class I felony counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2014)) against the victim, Nicole Malanowski. In count I, the State alleged that defendant sexually penetrated the victim by use of force and caused injury by striking her about the face. Count II alleged that defendant sexually penetrated the victim, knowing that she was unable to give knowing consent and caused injury to her by striking her about the face. Count III alleged that defendant knowingly committed an act of sexual penetration by use of force, and count IV alleged that he committed an act of sexual penetration, knowing that the victim was unable to give knowing consent.

¶ 5      In case No. 17-CF-2849, defendant was charged by a five-count information with unlawful possession with intent to deliver more than 5000 grams of a substance containing cannabis, a class X felony (720 ILCS 550/5(g) (West 2020)), unlawful possession of more than 5000 grams of a substance containing cannabis, a class I felony (720 ILCS 550/4(b) (West 2020)), obstructing justice (by providing a false name to a police officer), a class 4 felony (720 ILCS 5/31-4(a)(1) (West 2020)), driving while license revoked, a class 4 felony (625 ILCS 5/6-303 (West 2020)),

and fleeing or attempting to elude a police officer, a class A misdemeanor (625 ILCS 5/11-204(a) (West 2020)).

¶ 6    On May 8, 2018, pursuant to a fully negotiated plea agreement, defendant was convicted in case No. 17-CF-2849 on an amended charge of unlawful possession of cannabis with intent to deliver more than 2000 but less than 5000 grams of a substance containing cannabis, a class 1 felony.  720 ILCS 550/59(f) (West 2020).  Defendant pleaded guilty in case No. 15-CF-2857 to an amended charge of unlawful restraint of Malanowski, a class 4 felony (720 ILCS 5/10-3 (West 2020)), and, in an unrelated case (No. 15-DT-958), driving under the influence (625 ILCS 5/11-501 (West 2020).  Under the plea agreement, charges of obstructing justice, driving while license revoked, aggravated criminal sexual assault, and criminal sexual assault were dismissed.

¶ 7    In exchange for his pleas, defendant was sentenced 48 months' probation in case No. 17-CF-2849 and 24 months' probation in case Nos. 15-CF-2857 and 15-DT-958, to be served consecutively.  The agreement provided that defendant was to serve 36 months' periodic imprisonment (case No. 17-CF-2849), 200 hours' public service, have no contact or third-party contact with Malanowski (No. 17-CF-2857), cooperate with any evaluation and/or treatment recommendation by probation, and comply with all standard conditions of probation.

¶ 8    Among the standard conditions of probation that were imposed, defendant, in paragraph 13, agreed to

> "*consent to and submit to searches of* his/her person, residence, papers, automobiles, computers, *any device capable of accessing the internet or storing electronic data*, and/or other personal or real property accessible to Defendant at any time such requests are made by *a* Probation Officer.  Defendant consents to the use of anything

located, found or seized as evidence in any court proceeding and consents to the destruction of any contraband seized[.]"  (Emphases added.)

¶ 9     Defendant also agreed, upon request, to

"provide *the* Probation Officer with immediate access to any e-mail, text or messaging services, internet chat rooms, blogs, and social media websites Defendant uses to communicate with anyone, as well as any electronic devices including but not limited to telephones, *cellphones*, smartphones, computer tablets and computers with internet capability."  (Emphases added.)

¶ 10     The factual bases for defendant's pleas were as follows.  In case No. 17-CF-2849, on October 24, 2017, defendant drove a car that was pulled over by a Mundelein police officer for traffic violations.  A search of the car revealed an amount of cannabis that was vacuum-sealed in separate large portions that totaled at least 2000 grams but not more than 5000 grams.  The cannabis was packaged for distribution rather than personal use.  Defendant admitted to police that he intended to sell the cannabis.  In case No. 15-CF-2847, on February 15, 2014, defendant, several of his friends, and Malanowski went to various bars and then to an apartment in Lake County.  While at the apartment, defendant grabbed Malanowski about the body, thereby preventing her from leaving his immediate vicinity.  In doing so, without legal justification, defendant detained her.  In case No. 15-DT-958, a car defendant drove was stopped by a Lake County sheriff's officer for speeding and a lane violation.  The officer noted indicia of intoxication from alcohol about, and smelled the odor of alcohol on, defendant.  Defendant submitted to and failed field sobriety tests and provided a breath sample showing a breath alcohol content in excess of the legal limit of 0.08.

¶ 11    Defendant completed his 200 hours of public service, had no positive drug tests, and worked and cared for his daughter.  His probation officer recommended early release from periodic imprisonment, and, on October 1, 2018, the trial court stayed the remainder of his periodic imprisonment term.

¶ 12    On February 15, 2019, the State petitioned to revoke defendant's probation, alleging that he violated his curfew on November 3, 2018, and failed to submit to a drug drop when requested on January 6, 2019.  Pursuant to an agreement, defendant admitted that he failed to submit to a requested drug drop.  He was re-sentenced to probation, with the additional condition that he serve a 90-day term of electronic home monitoring.  All other terms and conditions of the May 8, 2018, probation order remained in effect.

¶ 13                    A. October 2019 Petition to Revoke Probation

¶ 14    On October 23, 2019, the State petitioned to revoke defendant's probation, alleging that defendant failed to comply with the following probation condition:

> "DEFENDANT SHALL UPON REQUEST PROVIDE THE PROBATION OFFICER WITH IMMEDIATE ACCESS TO HIS CELLULAR PHONE.  ON OCTOBER 9, 2019[,] THE DEFENDANT REFUSED TO ALLOW SURVEILLANCE OFFICER ZACH HRDLICKA ACCESS TO HIS CELLULAR PHONE."

¶ 15     On November 6, 2019, defendant moved to dismiss the petition (735 ILCS 5/2-619(a)(9) (West 2020)), arguing that (1) the probation order affirmatively defeated the grounds for the petition, where he agreed in the order to provide his probation officer, Ezra Elkins, with access to his cell phone and where his surveillance officer, Hrdlicka, was not his probation officer; and (2) Hrdlicka's request to access defendant's cell phone was an unreasonable search and invasion of privacy.

¶ 16                           B. Probation Revocation Hearing

¶ 17    On November 15, 2019, the court held a hearing on the State's petition to revoke and, pursuant to defense counsel's request, defendant's motion to dismiss. The court took judicial notice of defendant's probation order and read aloud two of the standard conditions in paragraph 13 that we quoted above.

¶ 18    Erika Elkins is a probation officer in the sex offender unit in Lake County. She supervises clients that are sentenced to probation for sex offenses and monitors the court order to ensure that clients complete all necessary treatment. She has consistent contact, in person and on the phone, with the clients she supervises. She currently supervises 75 clients, and defendant is on her caseload. Defendant was sentenced on May 8, 2018, and his case was added to Elkins' caseload about four days later. She met with defendant on May 15, 2018, at the adult probation office. She conducted an intake interview, reviewed defendant's court order and costs owed, and had him sign necessary paperwork.

¶ 19    Elkins explained that she read to defendant the court order line by line, including the bullet points in paragraph 13. Defendant asked no questions about cell phones, computers, or tablets being searched. She also discussed with defendant other people from probation that he might have contact with while on probation. She noted that a probation officer might come to his home to do a home visit, which is standard. They discussed drug tests that would be conducted. She had defendant sign an acknowledgement, which was admitted into evidence, that she reviewed with him the court order.

¶ 20    Elkins testified that she supervises "everything in the office." She conducts office visits, handles referrals to treatment agencies, manages communication with agencies, and checks in on clients' court-ordered conditions during each office visit. Another probation officer conducts the

home visits, random drug testing, verifies where the client lives, and verifies that he or she is complying with curfew and other stipulations. Elkins herself works in Waukegan and does not go into the field. Surveillance officers are officers who work primarily in the field (the probation field services unit). They work varied schedules (usually second or third shift, including weekends), whereas Elkins works from 7 a.m. to 4 p.m., Monday through Friday.

¶ 21 Elkins testified that surveillance officers are probation officers. Elkins previously worked in the surveillance services unit as a probation officer. Surveillance officers are sworn probation officers. When she was in the surveillance unit, she had a badge. She still has a badge, and it indicates that she is a probation officer. It indicated that she was a probation officer when she was in the surveillance unit as well.

¶ 22 On cross-examination, Elkins testified that there is no difference between a surveillance officer and a probation officer. Surveillance officers have their own probationers/caseload. Elkins was not the only person assigned to defendant as a probation officer.

¶ 23 Zack Hrdlicka testified that he works as an adult probation officer in Lake County. He is assigned to the probation field services unit, which specializes in home visits, treatment visits, work visits, etc. He primarily works second and third shift. Hrdlicka has about 120 people in his caseload. His badge identifies him as a probation officer for Lake County and specifically says "probation officer."

¶ 24 Hrdlicka has interacted with defendant about seven or eight times, including at defendant's home in Gurnee and at his treatment provider. On October 9, 2019, at about 10 a.m., Hrdlicka conducted an unannounced treatment visit on defendant at the treatment provider, One Hope United. He was there to verify that defendant was attending treatment. Hrdlicka remained in the parking lot. Initially, he did not see defendant, but, after about 40 minutes, he observed defendant

exit the treatment provider. Hrdlicka confronted defendant and asked questions, including how he was doing, what he discussed in treatment, and what they were going to do in treatment. Defendant was compliant. He also asked defendant to empty his pockets, which he did. In his front left pant pocket, defendant had a large amount of money. In his front right pant pocket, he had more money and a phone. Hrdlicka observed that the cell phone was turned on because, when defendant pulled it out of his pocket, he saw the phone's home screen light up.

¶ 25    Hrdlicka asked defendant to see his phone, and defendant replied that it was off. Hrdlicka confronted defendant, stating that he saw the phone turn on and asked again to see it, but defendant replied "no." Hrdlicka advised defendant that, if he refused to let him search his phone, then it would constitute a probation violation. Defendant replied, "[t]hen violate me then," got into his vehicle, and drove away. Hrdlicka testified that he wanted to see defendant's phone because his court order allowed probation to look through it. During the encounter, defendant's demeanor changed, and defendant became more agitated. When he left, he did not say goodbye. Hrdlicka requested to see the phone about three times.

¶ 26    This was not the first time Hrdlicka asked to see defendant's phone. During a prior home visit, Hrdlicka asked defendant to see his phone, and defendant replied that his brother had the phone.

¶ 27    On cross-examination, Hrdlicka testified that his designation is a probation officer who specializes in surveillance. On October 9, 2019, he did not identify himself to defendant as a probation officer, but he wore his badge and his bullet-proof vest that specified probation officer on it. He also did not identify himself as a surveillance officer.

¶ 28    Hrdlicka started seeing defendant around August. The office probation officer would have told defendant about doing any public service hours. Hrdlicka was not his office probation officer.

"I'm his field." When asked what he wanted to see on defendant's cell phone, Hrdlicka replied he wanted to ensure that defendant was abiding by the court order. Reviewing messages and "any type of internet services," Hrdlicka would learn if defendant had any contact with the victim or if he was engaged in any type of illegal activities. Hrdlicka searches other probationers' phones.

¶ 29    Hrdlicka does not review the court order with probationers or conduct intake interviews. Elkins reviews the court order with probationers. Hrdlicka is in regular communication with Elkins or his probationers' office probation officer.

¶ 30    Defendant testified in his own defense that he reviewed the probation order with Elkins' predecessor. When he first met with Elkins, they did not review the order, and Elkins told defendant that she was going to be his probation officer. He understood Elkins to be his probation officer. Hrdlicka had first identified himself, in August after defendant was released from work release, as defendant's surveillance officer.

¶ 31    Defendant further testified that, on October 9, 2019, he exited his treatment and was approached by Hrdlicka, who asked how he was doing, what was going on, and whether he was at treatment. After discussing treatment, Hrdlicka asked defendant to empty his pockets, and defendant complied. He also asked defendant about his car. Hrdlicka then asked for defendant's cell phone, and defendant told him that it was dead. He then proceeded to leave. Defendant went home and recharged the phone. He also called Elkins, told her what had happened, and stated that, if she wanted him to drop off the phone, he would do so, but warned her that it contained explicit photos of his fiancé. Defendant testified that, if his phone was not dead, he still would not have given it to Hrdlicka because of the photos on it.

¶ 32    Defendant believed that Hrdlicka was not his probation officer. He was his surveillance officer, who came by, made sure defendant was home, and was not doing drugs. Hrdlicka never

reviewed with defendant the court order. When defendant has spoken with Elkins, she has stated, "I'm your probation officer."

¶ 33 On cross-examination, defendant identified his signature on the exhibit of the court order, and agreed it was dated May 15, 2018. He met Hrdlicka about five or seven times. Hrdlicka had previously asked for defendant's phone. He did not believe Hrdlicka would ask for it again.

¶ 34 The trial court revoked defendant's probation, finding that he had violated the conditions of his probation by failing to provide Hrdlicka with immediate access to his cell phone. It found that Elkins was defendant's probation officer and that Hrdlicka was the other probation officer (who was operating in a capacity of a surveillance officer). The court noted that defendant had a diminished expectation of privacy by virtue of being on probation. It found that defendant recognized that the "surveillance officer operated in an authority position of a probation officer," had multiple contacts with defendant, and asked him to do multiple things as conditions of his probation. Defendant "recognized that probation wanted access" to his phone, and it was entitled to access, as the court order, it found, allowed it. Defendant had not allowed access on a previous occasion. The court found it telling that defendant responded to "violate me" at one point. Accordingly, given the probation violation, the court revoked defendant's probation.

¶ 35                              C. Sentencing

¶ 36 Prior to the sentencing hearing, on November 18, 2019, the State informed the court that probation personnel had searched defendant's phone after the revocation hearing and claimed that the phone had nothing on it. On September 25, 2020, the State informed the court that probation wanted to search defendant's cell phone again and that there was some confusion as to whether defendant had his own cell phone or was using his brother's phone. The court ordered defendant to bring to probation the phone he had been using.

¶ 37    A presentence investigation report (PSI) was submitted to the court with supporting documents from defendant's current and previous terms of probation. An addendum was also filed due to a delay in sentencing, including due to a change in defense counsel, COVID-19, and delays with the investigation. The reports reflected that defendant, age 20 and 23 at the time of the offenses, grew up in Zion and Gurnee, areas he described as having a lot of gun violence, drug use, and police brutality. Up until third grade, defendant lived with his uncle, who was addicted to crack cocaine. Defendant's mother, who resided with them until defendant was one year old, believed that defendant kept his uncle from using drugs. While living with his uncle, defendant stayed out all night due to the lack of supervision. During this time, he witnessed a friend get shot, he started using alcohol and cannabis at age 10, and was adjudicated delinquent for the first time at age 12. After his uncle inappropriately twice touched defendant's genitals, defendant moved in with his mother. Shortly thereafter, he began cutting his wrists. Defendant struggled with suicidal thoughts beginning at age eight.

¶ 38    Defendant's juvenile records reflected that he reported symptoms of depression, had suicidal thoughts, was diagnosed with attention deficit hyperactivity disorder, and was placed in special education services after being diagnosed with emotional disturbance. He also had a history of drug abuse. Defendant's adult probation records documented diagnoses for depressive disorder, anxiety disorder, posttraumatic stress disorder, alcohol use disorder, cannabis disorder, and various personality disorders. The assessments reflected that defendant was on the low end of average intellectual functioning.

¶ 39    While on juvenile probation, defendant participated in mental health and drug treatment, but never successfully completed any terms of juvenile probation. He had one prior adult

conviction for aggravated battery of a school employee. He was originally sentenced to probation but was later sentenced to two years' imprisonment after his probation was revoked.

¶ 40    While on probation in this case, defendant participated in sex offender treatment. He had some missed appointments after his therapists switched to telehealth appointments. As part of his sex offender treatment, defendant was required to participate in a polygraph examination, which he completed. Defendant denied nonconsensual contact with the complaining witness in the unlawful restraint case. During the exam, he admitted to having sexual contact with the witness but denied any nonconsensual contact. The examiner concluded that no deception was indicated.

¶ 41    Defendant graduated from high school, worked full time at JM Heating and Cooling (since October 2018), and financially supported his daughter, age four, whom he co-parented with her mother.

¶ 42    At the sentencing hearing, on October 29, 2020, Elkins testified that defendant was assigned to her in October 2017. When he was first assigned, he was serving a period of periodic imprisonment at the Lake County jail. His compliance was better during periodic imprisonment because it is a structured environment. In October 2018, defendant was released from periodic imprisonment. In March 2019, Elkins filed a request for a petition to revoke defendant's probation based on his refusal to complete a drug test. As a result of the petition being filed, defendant admitted to the petition and had an additional 90 days of electronic home monitoring added to his sentence.

¶ 43    On November 15, 2019, a second petition-to-revoke hearing was held. The basis for the hearing was that defendant refused to hand over his cell phone for a search. Defendant was ordered to turn over the phone, which he did. There was very little activity on the phone. It was essentially an empty phone.

¶ 44    When Elkins called defendant, she called a number that he stated was his brother's number. She has had three numbers for defendant, and she received one when she was initially on the case until after the revocation hearing. Defendant's new phone number is his brother's number. Defendant denies he has his own cell phone. However, the old phone number appeared to still be working because it would still ring and go to voicemail, but no one picked up or called back.

¶ 45    On September 25, 2020, defendant was ordered to bring in the cell phone he had been using to be searched. Elkins spoke to him on the phone, and defendant told her that he did not have his brother's phone and that his brother was out of state. He brought the cell phone to probation on September 28, 2020. On that date, Elkins searched the phone and discovered that it could only be used with Wi-Fi and only had a few contacts, calls, and text messages. During defendant's last office visit, he denied having his own cell phone and maintained that he used his brother's phone.

¶ 46    During an October 19, 2020, office visit, defendant was "combative and curt." He stated that he was upset, felt that he had been racially profiled in this case, and that this was all ridiculous. Then, there was an escalation in communications and defendant began to swear about the situation. Elkins terminated the office visit because defendant was not willing to speak in a respectful manner and not raise his voice. He left Elkins' office when she asked him to, and she did not have any concerns for her physical safety.

¶ 47    While he was on probation, defendant had a Facebook account—TevinTooSmooth. One post included photographs of defendant's polygraph report and a photo of a woman whom Elkins did not recognize. Elkins confirmed that Malanowski, whom defendant was ordered to have no contact with, was tagged in the post, *i.e.*, her account was connected to the post and she was alerted that she was tagged.

¶ 48    As part of his probation, defendant was ordered to undergo substance abuse treatment, and he complied.  He also completed his public service hours.  He never tested positive for drugs.  Defendant has always held a full-time job.

¶ 49    The cell phone provision is a standard condition of probation.  In the sex offender unit, assess to a cell phone is particularly important.

¶ 50    When asked about new arrests, Elkins testified that defendant was arrested for domestic battery.  Defendant did not successfully complete sex offender treatment.  He missed dates for his treatment, and he was sent a warning letter that he would be arrested if he missed any more dates.

¶ 51    Malanowski testified about defendant's Facebook posts.  On October 19, 2020, she received nine Facebook notifications that defendant had tagged her, *i.e.*, linked her, in a post.  Malanowki had blocked defendant's old Facebook page and initially did not recognize the TevinTooSmooth account.  She realized it was defendant after reading the post, which stated, "AMERICAS LAWS ARE SET UP TO CONVICT & IMPRISON INNOCENT BLACK MEN & MAKE SURE THEY NEVER SEE THE LIGHT OF DAY!  TWO WHITE MEN WALKED AWAY WITHOUT CRIMINAL CHARGES!"  The post contained a photograph of defendant and Malanowski from 2015 and photographs of the polygraph report, which Malanowski eventually realized was about her.  The post also contained a photograph of defendant on the Sheriff's website with the word "captured" across it.  Defendant commented on the post, asking other people to ask Malanowski why she lied and tagged Malanowski's Facebook account.  The post was shared multiple times, and Malanowski received a notification each time it was shared.

¶ 52    Hrdlicka testified that the phone defendant turned over on November 16, 2019, was a different phone from what he saw at the treatment provider, although he could not say for certain.

There was very little data on the phone. There were messages from defendant's fiancé and messages to his probation officer.

¶ 53    Andrea Sobon, the mother of defendant's four-year-old daughter, testified for defendant in mitigation. Defendant is an "amazing father" and saw his daughter every day. Sobon had known defendant since he was 19 and had seen how far he had come. Their daughter was old enough to know what was going on and how a prison sentence would negatively affect her.

¶ 54    In argument, the State asked the court to sentence defendant to 12 years' imprisonment (to be served at 50%), asserting that he did well in the structured environment of periodic imprisonment and on electronic home monitoring. It suggested that defendant used his cell phone to sell cannabis and argued that his Facebook post and his juvenile and criminal history were aggravating factors. Defense counsel asked the court to sentence defendant to a term of periodic imprisonment. He asserted that defendant was not a threat to society, has had untreated mental health problems throughout his life for which he could seek treatment if he received such a sentence, and he could see his daughter. Defendant was not provided mental health treatment while on probation, but instead provided sex offender treatment, which was a very specific and intense treatment. Counsel acknowledged defendant's Facebook post was a mistake and made out of anger but the photo on the Sheriff's website and the polygraph results helped explain his actions.

¶ 55    In allocution, defendant begged the court for the opportunity to be with his daughter and to right his wrongs. He apologized to the court.

¶ 56    The trial court resentenced defendant to 8½ years' imprisonment for unlawful possession of cannabis with intent to deliver and 3 years' imprisonment for unlawful restraint, to be served concurrently and with credit for 431 days of time previously served. The court noted that defendant had been "under the eye of the court" since 2008. He had been on both juvenile and

adult probation "with a variety of supports and services," but continued to reoffend and be unsuccessful in complying with probation opportunities. The court found that defendant had been deceptive and manipulative while on probation. The court acknowledged the impact a prison sentence will have on defendant's daughter but noted that this factor alone could not sway its decision. The court also ordered defendant to take down his Facebook account within 48 hours.

¶ 57    Defendant moved to reconsider the sentences, arguing that they were excessive in light of the mitigating evidence. He also asserted that he had not violated the law or rules of probation by "not providing his cell phone to probation" and that the court gave too much weight to that evidence. At the hearing on the motion, defense counsel argued that the court did not balance the evidence of defendant's conduct in tagging the victim of the unlawful restraint offense on Facebook against defendant's feelings of anguish about being accused and convicted. The court denied defendant's motion, finding that it had considered all factors in mitigation and defendant's rehabilitative potential. Defendant appeals.[1]

¶ 58                                  II. ANALYSIS

¶ 59                           A. Probation Violation

¶ 60    Defendant argues first that the State failed to prove that he violated a condition of his probation. Specifically, he contends that the requirement that he provide "the probation officer" with immediate access to his cell phone did not reasonably inform him that he was required to give access to a probation surveillance officer who was assigned to monitor his performance on probation. The common understanding of "the probation officer," defendant maintains, is the

---

[1]On December 28, 2020, pursuant to defendant's unopposed motion, this court consolidated the appeals in case Nos. 2-20-0727 and 2-20-0728.

person he met with at the probation office, not the person who conducted field visits. For the following reasons, we reject defendant's argument.

¶ 61 A violation of a condition of probation must be proved by the State by a preponderance of the evidence. 730 ILCS 5/5-6-4(c) (West 2020). "A proposition is proved by a preponderance of the evidence when the proposition is more probably true than not true." *People v. Love*, 404 Ill. App. 3d 784, 787 (2010). When the evidence is conflicting, the trial court is responsible for weighing the credibility of witnesses and evaluating the testimony. *People v. Crowell*, 53 Ill. 2d 447, 451-52 (1973). A trial court's ruling on a petition to revoke probation will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Love*, 404 Ill. App. 3d at 787. A finding is against the manifest weight of the evidence where the trial court's ruling is unreasonable. *People v. Shelby*, 221 Ill. App. 3d 1028, 1039 (1991).

¶ 62 A sentence of probation is an agreement between the probationer and the State, and, in light of the serious consequences imposed if the agreement is broken, it is important that there be an unambiguous, memorialized understanding of what is required of the probationer. *People v. Saucier*, 221 Ill. App. 3d 287, 291-92 (1991). As such, the probationer must be given a probation order or certificate reasonably specifying in writing what mandatory conditions apply to his or her probation. *Id.* at 292; 730 ILCS 5/5-6-3(d) (West 2020).

> "A probationer whose probation the State seeks to revoke must be accorded substantial justice. *People v. White*, 33 Ill. App. 3d 523, 528 (1975). While the defendant at a probation revocation proceeding is not entitled to the same protections afforded a defendant initially standing trial for the substantive criminal offense (*Cox*, 197 Ill. App. 3d at 243-44), he [or she] is nevertheless entitled to 'minimal due process.' *People v. Hill*, 208 Ill. App. 3d 887, 891 (1991). Due process requires a fair determination that the acts

which formed the basis for the revocation did occur and that fairness be accorded a defendant during the proceedings. See *People v. Allegri*, 127 Ill. App. 3d 1041, 1046 (1984) (discussing minimal due process requirements), *aff'd*, 109 Ill. 2d 309 (1985). A sentence of probation constitutes a form of agreement between the offender and the criminal justice system, and, because of the severity of the consequences if the agreement is broken, it is important that there be a definite, memorialized understanding of what is required of defendant. *People v. Brown*, 137 Ill. App. 3d 453, 455 (1985)." *Saucier*, 221 Ill. App. 3d at 291-92.

¶ 63    Further, "[i]t is well established that only 'minimum requirements' of due process need be applied at a probation revocation hearing." *People v. Acevedo*, 216 Ill. App. 3d 195, 200 (1991). These "minimum requirements" include the following: written notice of the claimed probation violation; disclosure to the probationer of the evidence against him [or her]; the opportunity to be heard in person and present evidence; and the right to confront and cross-examine witnesses. *People v. Cox*, 197 Ill. App. 3d 239, 243 (1990).

¶ 64    Furthermore,

"[d]ue process requires that a person know in advance what behavior is expected or prohibited. Thus, it has been held that a condition of probation affords fair notice of what conduct is prohibited where the average person would understand the meaning of the condition. See 3 W. LaFave & J. Israel, Criminal Procedure § 25.3(c), at 145 (1984); *Brown v. State*, 406 So.2d 1262, 1263 (Fla. App. 1981) (average person would understand the meaning of admonition to "Stay away from bars")." *Saucier*, 221 Ill. App. 3d at 292.

¶ 65    Here, again, among the standard conditions of probation that were imposed, defendant, in paragraph 13, agreed to

> "consent to and submit to searches of his/her person, residence, papers, automobiles, computers, any device capable of accessing the internet or storing electronic data, and/or other personal or real property accessible to Defendant at any time such requests are made by *a* Probation Officer. Defendant consents to the use of anything located, found or seized as evidence in any court proceeding and consents to the destruction of any contraband seized[.]" (Emphasis added.)

¶ 66    Defendant also agreed, upon request, to

> "provide *the* Probation Officer with immediate access to any e-mail, text or messaging services, internet chat rooms, blogs, and social media websites Defendant uses to communicate with anyone, as well as any electronic devices including but not limited to telephones, *cellphones*, smartphones, computer tablets and computers with internet capability." (Emphases added.)

¶ 67    In its petition, the State alleged that failed to comply with the condition that he provide "the probation officer" with immediate access to his cell phone when he refused to allow surveillance officer Hrdlicka to access his cell phone.

¶ 68    The trial court found that Elkins was defendant's probation officer and that Hrdlicka was the other probation officer (who was operating in a capacity of a surveillance officer). It also found that defendant recognized that the "surveillance officer operated in an authority position of a probation officer," had multiple contacts with defendant, and asked him to do multiple things as conditions of his probation. Defendant "recognized that probation wanted access" to his phone, and it was entitled to access, as the court order allowed it. Defendant had not allowed access on a previous occasion. The court found it telling that defendant responded "violate me" at one point. Accordingly, given the probation violation, it revoked defendant's probation.

¶ 69    Defendant argues that the trial court's ruling was erroneous, because the evidence showed that he refused to give his cell phone to a person who had identified himself as a surveillance officer, not a probation officer. The common understanding of the probation order, he asserts, is that he was required to provide his cell phone to his probation officer ("the probation officer"), not surveillance officers like Hrdlicka. The probation order, defendant notes, required him to provide "the Probation officer" access to his cell phone when requested and to submit to searches of electronic devices that can access the internet when requested by "a Probation Officer." The order, defendant notes, does not mention a "surveillance officer" and does not define "probation officer." Further, in its petition to revoke, the State identified Hrdlicka as a "surveillance officer" and Elkins testified that probation officers who work in the field, such as Hrdlicka, were referred to as "surveillance officers."

¶ 70    Defendant contends that case law instructs that probation conditions must be read consistent with their common everyday understanding and that the common understanding is that probation officers are the people probationers report to at the probation office. See *Saucier*, 221 Ill. App. 3d at 289-91 (no probation violation where order prohibited the defendant from having "unsupervised" contact with minors, and the defendant, who was on periodic imprisonment, twice drove by the minor victim and waved at her and victim was with one or more adults when incidents occurred); see also *People v. McClellan*, 353 Ill. App. 3d 1027, 1028, 1033-35 (2004) (probation revocation reversed; probation condition required the defendant to "complete" sex offender counseling, and she was discharged "unsuccessfully" because she never admitted guilt of the offense).

¶ 71    The State contends that the term "probation officer" in the probation order is not ambiguous. The term, it argues, did not identify a specific probation officer assigned or known to

a probationer. The order's conditions that defendant consent and submit to searches of his cell phone any time "a probation officer" requested access to his phone and to "provide the Probation officer with immediate access" to his cell phone, the State maintains, would commonly be understood to mean requests for access by *any* probation officer, not a single, office-bound, or specific probation officer, as defendant argues. The plain language of the probation order, the State asserts, reasonably informed defendant that he was required, upon request, to give probation surveillance officer Hrdlicka immediate access to his cell phone.

¶ 72    We conclude that the probation condition that defendant provide "the" probation officer with access to his cell phone unambiguously encompasses within its common meaning surveillance officers. If the standard conditions in paragraph 13 meant to distinguish between a probation officer and someone who is a surveillance officer, we believe that the requirements would have been organized in a manner distinguishing the duties of one type of officer versus another, such as separately grouping defendant's obligation as to each officer. Instead, paragraph 13 consists of bullet points referencing "the Probation Officer," "a Probation Officer," or merely "Probation Officer" (with no article) in no ascertainable organizational scheme or order. For example, "the" Probation Officer must be notified of changes of address, telephone number, new arrests/citations, and be permitted to visit defendant's home and be provided, upon request, with immediate access to his cellphone. "A" Probation Officer may request that defendant consent to and submit to searches of any device capable of accessing the internet or storing electronic data and may direct defendant to submit to a random drug test. There is no organizational or thematic scheme in paragraph 13. Thus, we cannot conclude that the distinction defendant suggests between the use of "the" and "a" was intended or could be reasonably inferred. At least one other court has reached the same conclusion that we come to today. See *Belvin v. State*, 470 S.E.2d 497, 498 (Ga.

Ct. App. 1996) ("Webster's Third New International Dictionary defines 'probation officer' as 'an officer appointed to keep under supervision and to report on a convicted offender who is free on probation.' Clearly a surveillance officer employed by the probation office and given the power to supervise and discipline probationers is a 'probation officer' under this definition, as well as the common meaning of the term.").

¶ 73    The testimony at the probation revocation hearing is consistent with this conclusion. Turning first to Elkin, a probation officer in the sex offender unit, she testified that she reviewed the court order with defendant and discussed with him that other people from probation might have contact with him, including that a probation officer might visit his home to conduct a home visit. Elkins supervises "office" matters, and another probation officer conducts the home visits, drug testing, verification of address, curfew, and other stipulations. She does not go into the field. Rather, surveillance officers, who are sworn probation officers, work in the field. Elkins previously worked as a surveillance officer, and she testified that there is no difference between a probation officer and a surveillance officer. Elkins was defendant's probation officer, but others were assigned to defendant as his probation officer.

¶ 74    Hrdlicka, a probation officer assigned to the probation field services unit, testified that he wears a badge that identifies him as a probation officer. On October 9, 2019, he conducted an unannounced treatment visit on defendant and, wearing his badge and a bullet-proof vest that specified probation officer on it, asked defendant for his cell phone, and defendant refused. When he warned defendant that his refusal would constitute a probation violation, defendant replied, "[t]hen violate me then." This was not the first time that Hrdlicka requested to see defendant's cell phone. On a prior home visit, he asked for the phone and defendant replied that his brother had it. Thus, although defendant testified that he understood Elkins to be his probation officer, on

neither occasion did defendant protest that Hrdlicka had no authority to ask for the phone and acknowledged that Hrdlicka had previously asked for his phone.

¶ 75    We also note that our holding is consistent with the Probation and Probation Officers Act (730 ILCS 110/0.01 *et seq.* (West 2020)), which broadly defines a probation officer as "a person employed full time in a probation or court services department[.]"  730 ILCS 110/9b(3) (West 2020).

¶ 76    Based on the foregoing, the trial court did not err in finding that defendant violated his probation when he refused to give surveillance officer Hrdlicka immediate access to his cell phone.

¶ 77                    B. Reasonableness/Constitutionality of Probation Conditions

¶ 78    Next, defendant argues that the probation conditions requiring him to submit to searches of his cell phone were unreasonable and unconstitutional because they were unrelated to his offenses, required no suspicion of wrongdoing, and violated his privacy rights.  For the following reasons, we reject defendant's argument.

¶ 79    Preliminarily, the State responds that defendant has forfeited his argument for failure to raise it below.  Defendant maintains that the record rebuts this contention.  He points to his motion to dismiss, wherein he argued that Hrdlicka's request to access his cell phone was "unreasonable and a violation of his privacy."  Further, he points to the hearing, where he argued that, by agreeing to be on probation, he did not give up all of his constitutional rights.  Finally, he notes that he made an oral motion to reconsider his motion to dismiss, which the court denied.  Thus, he asserts that he preserved the issue.  Alternatively, defendant asks that, if we conclude that he did not preserve the issue, we review it for plain error.  See *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000) (plain error may be properly raised for the first time in a reply brief).  He contends that there was error under both prongs.  We conclude that defendant preserved the issue.

¶ 80    We review *de novo* the question whether an individual's constitutional rights have been violated. *People v. Burns*, 209 Ill. 2d 551, 560 (2004).

¶ 81    "Probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty." (Internal quotation marks omitted.) *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987). The purpose of probation "is to benefit society by restoring a defendant to useful citizenship, rather than allowing a defendant to become a burden as an habitual offender. *People v. Meyer*, 176 Ill. 2d 372, 379 (1997). Thus, probation "simultaneously serves as a form of punishment and as a method for rehabilitating an offender." *Id.* "Protection of the public from the type of conduct that led to a defendant's conviction is one of the goals of probation." *Id.*

¶ 82    "Inherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled." ' " *United States v. Knights*, 534 U.S. 112, 119 (2001) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987), quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). "[T]he need to supervise a probationer, foster his [or her] rehabilitation, and protect the public permit[s] a court to impose restrictions on his [or her] constitutionally protected freedoms that would not be reasonable to impose on the public at large." *In re K.M.*, 2018 IL App (1st) 172349, ¶ 57, 426. See also *People v. Absher*, 242 Ill. 2d 77, 83 (2011) (where a defendant "is serving a term of probation, the restrictions placed on upon his [or her] conduct due to the terms of [the] probation agreement results in his [or her] having a 'significantly diminished' expectation of privacy.").

¶ 83    The government violates the fourth amendment either by (1) a warrantless intrusion onto a person's property; or (2) by a warrantless infringement of a person's societally recognized privacy. *People v. Lindsey*, 2020 IL 124289, ¶ 17. Under the privacy-based approach to the fourth

amendment, "[w]hen the government, even in the absence of a physical intrusion into a constitutionally protected area, obtains information by invading a reasonable expectation of privacy in persons, houses, papers, or effects without a warrant, an unconstitutional search occurs." *Id.* ¶ 33.

¶ 84     In *Absher*, the defendant had entered into a fully negotiated plea agreement for retail theft in which he received a term of probation that included the condition that he submit, upon the probation officer's request, to searches of his "person, residence, papers, automobile and/or effects" and that he consent to the use of anything seized during the searches in court proceedings. *Absher*, 242 Ill. 2d at 89-90.  Police officers found cocaine and marijuana in the defendant's residence during a search pursuant to the probation condition, and he was subsequently charged with possession of a controlled substance.  The defendant moved to suppress the drugs on the basis that the search violated his fourth amendment privacy rights, and the supreme court held that the defendant had prospectively waived his rights by knowingly and voluntarily agreeing to suspicionless searches as a condition of his probation pursuant to the plea agreement.  *Id.* at 84, 90-91.  The court relied on *United States v. Barnett*, 415 F.3d 690, 691-92 (7th Cir. 2005), which utilized a contract-law analysis because the defendant had entered into a fully negotiated guilty plea, and held that a probationer may waive his or her already diminished expectation of privacy when the waiver is knowing and intelligent.  *Id.* at 84-85.  Reviewing its own precedent, the supreme court noted that fully negotiated guilty pleas are subject to contract-law principles.  *Id.* at 87.  The defendant's agreement in *Absher* to a suspicionless search condition in his probation order, the court held, constituted his prospective consent (and it was undisputed it was explained to him and that he understood its provisions and freely signed it).  *Id.* at 88, 90-91.

¶ 85    Similarly, in *People v. Thornburg*, 384 Ill. App. 3d 625 (2008), the defendant probationer had, as part of his plea agreement, signed a probation agreement and a computer use agreement, the latter of which prohibited him from possessing any adult pornography and allowed for suspicionless searches of the defendant's computer.  Probation officers conducted a field visit to the defendant's home, searched a bedroom and a computer, and discovered pornographic material. As relevant here, as to the computer, this court concluded that the defendant had agreed in the computer use agreement to submit to a computer search at any time (and the agreement did not require that the officers have reasonable suspicion to do so).  *Id.* at 634-35.  We noted that a "probationer does not enjoy the absolute liberty that every citizen enjoys but only conditional liberty based on restrictions contained in a probation agreement." *Id.* at 635.  The agreement, we held, sufficiently eliminated the defendant's expectation of privacy such that he consented to a waiver of his fourth amendment rights with respect to his computer, and the search of his computer was valid.  *Id.* at 636-37.  See also *People v. Wilson*, 228 Ill. 2d 35, 52 (2008) (fourth amendment does not prohibit a police officer from conducting a suspicionless search of a parolee, where the parole agreement contained no limit on searches of the parolee's person, property, or residence, and recognizing a distinction between probationers and parolees, the latter of which have a lower expectation of privacy because they pose a higher risk to the public).

¶ 86    Defendant argues that the foregoing cases are no longer good law.  He relies on several more recent cases that he argues show that the searches that he accepted in his agreement were unreasonable as a constitutional matter and, therefore, unenforceable.  See *Riley v. California*, 573 U.S. 373, 384-86 (2014) (in two cases, issue was whether police may conduct a warrantless search of digital information on an *arrestee's* cell phone; holding that "officers must generally secure a warrant before conducting" searches of data on cell phones seized incident to arrest; noting the

search-incident-to-arrest exception is grounded in concerns for officer safety and evidence preservation); *United States v. Knights*, 534 U.S. 112, 119-21 (2001) (upholding warrantless search by police officers of probationer's home based on reasonable suspicion; probationer, who had signed a probation agreement containing a search condition that stated that he would be subject to a search, which included his residence, at any time and any place, had a significantly diminished expectation of privacy; warrantless search "supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the fourth amendment").

¶ 87　　We disagree with defendant that these cases control. *Riley* involved an arrestee, not a probationer, and the court noted that the search-incident-to-arrest exception to the fourth amendment's warrant requirement is grounded in concerns for officer safety but that certain case-specific exceptions may justify warrantless searches of a phone. *Riley*, 573 U.S. at 401-02. Further, we note that an arrestee has not been charged and tried, whereas a probationer such as defendant has either pleaded or been found guilty and is serving a term of probation under which he or she has a diminished expectation of privacy. Thus, *Riley* does not apply. In *Knights*, the police *had* reasonable suspicion, and the Court explicitly did *not* reach the issue of the constitutionality of suspicionless searches in the context of whether a probation condition constitutes consent. *Knights*, 534 U.S. at 119-20 n.6.

¶ 88　　Defendant also points to cases he asserts apply *Riley* and conclude that warrantless searches of probationer's cell phones violate the fourth amendment. See *United States v. Lara*, 815 F.3d 605, 609 (9th Cir. 2016) (relying on its precedent and holding that question was not solely whether the probationer accepted a cell phone search as a condition of his probation (which did not explicitly refer to cell phones), but whether the search that he accepted was reasonable; the probationer's acceptance of the terms of probation, including suspicionless searches of his person

and property, "is one factor that bears on the reasonableness of the search, but it is not in itself dispositive"); *In re Ricardo P.*, 446 P.3d 747, 751, 757-58 (Cal. 2019) (juvenile probationer for felony burglary challenged warrantless electronic search probation condition; precedent required that probation condition concerning conduct that itself is not criminal is valid if reasonably related to the crime of which the defendant was convicted or to future criminality; held that warrantless search of the probationer's electronic devices, where there was no indication that he had used them or would use them in connection with drugs or any illegal activity, was not reasonably related to future criminality and was invalid; noting "the potentially greater breadth of searches of electronic devices compared to traditional property or residence searches"; although not categorically invalidating electronic search conditions, condition in case before it imposed " a burden that is substantially disproportionate to the legitimate interests in promoting rehabilitation and public safety"). We decline defendant's request to follow these foreign cases. They conflict with our supreme court's holding in *Absher*, which we are bound to follow. *People v. Pruitt*, 239 Ill. App. 3d 200, 209 (1992) (appellate court does not have authority to overrule or modify supreme court precedent). In this case, on the same day that defendant entered his plea, he signed off on the cell phone conditions. Furthermore, unlike here, the operative probation agreement in *Lara* did not unambiguously include cellphones as searchable items. *Lara*, 815 F.3d at 610 (probationer agreed to "submit [his] person and property, including any residence, premises, container or vehicle under [his] control to search and seizure").

¶ 89    Finally, defendant argues that the suspicionless search conditions did not reasonably relate to the nature of the offenses or his rehabilitation. See *In re J.W.*, 204 Ill. 2d 50, 79 (2003) (it is appropriate in assessing reasonableness of probation condition to consider whether restriction reasonably relates to nature of offense or probationer's rehabilitation). He notes that he was on

probation for possession of cannabis with intent to deliver and unlawful restraint. The offenses, he argues, did not involve the use of a cell phone or any other electronic device, and there was no evidence that suggested that monitoring his cell phone would prevent or deter future criminal conduct. We disagree. Pursuant to his plea agreement, defendant agreed to have no contact or third-party contact with Malanowski. This agreement and the fact that he pleaded guilty to possession with intent to deliver formed the reasonable basis to impose the suspicionless cell phone search condition in his probation agreement. The phone could be searched to verify that defendant had not attempted to contact Malanowski and to verify that he was not selling cannabis.

¶ 90     In summary, defendant's constitutional challenge fails.

¶ 91                                    C. Sentence

¶ 92     Defendant's final argument is that the trial court erred in resentencing him to 8½ years' imprisonment for the cannabis offense after revocation of his probation. He asserts that the court improperly punished him for his probation conduct and failed to adequately consider the seriousness of the original offense and his rehabilitative potential, significant mental health history, and childhood traumas. He asks this court to reduce his sentence to the minimum or no more than five years in prison, or, alternatively, to vacate his sentence and remand for a new sentencing hearing. For the following reasons, we reject defendant's argument.

¶ 93     A sentence will be disturbed on appeal only if the sentencing court abused its discretion. *People v. Tye*, 323 Ill. App. 3d 872, 887 (2001). A reviewing court defers to the trial court's decisions concerning sentencing and presumes that the trial court considered only appropriate factors in sentencing unless the record affirmatively shows otherwise. *People v. Lurks*, 241 Ill. App. 3d 819, 827 (1993).

¶ 94    The Illinois Constitution requires that penalties be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Center*, 198 Ill. App. 3d 1025, 1032-33 (1990). This constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of punishment.   *Center*, 198 Ill. App. 3d at 1033.   This balancing process requires careful consideration of all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it.  *Id.*  The trial court is not required to detail precisely for the record the exact process by which it determined the penalty, nor articulate its consideration of mitigating factors, or make an express finding that defendant lacked rehabilitative potential. *People v. Redmond*, 265 Ill. App. 3d 292, 307 (1994).  The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors such as the lack of a prior record, and the statute does not mandate that the absence of aggravating factors requires the minimum sentence be imposed.  *Id.*

¶ 95    After revoking a sentence of probation, the trial court may resentence a defendant to any sentence that would have been appropriate for the original offense.  *People v. Young*, 138 Ill. App. 3d 130, 134-35 (1985); 730 ILCS 5/5-6-4(e) (West 2020).  The court *may* consider the defendant's conduct while on probation in reassessing his or her *rehabilitative potential.  Young*, 138 Ill. App. 3d at 135.  Thus, such conduct may be considered as an *aggravating factor* and may lead to a sentence more severe than that which the court would have initially imposed.  *People v. Turner*, 233 Ill. App. 3d 449, 456-57 (1992).  However, the sentence imposed must not be punishment for the probation violation.  *Young*, 138 Ill. App. 3d at 135.  A sentence within the statutory range for

the offense will not be disturbed as an abuse of the sentencing court's discretion unless this court is strongly persuaded that the trial court intended to penalize the defendant for violating his or her probation. *Id.* at 142.

¶ 96 The sentencing range for unlawful possession of more than 2000 grams but less than 5000 grams of cannabis, a class I felony, is 4 to 15 years' imprisonment. 720 ILCS 550/5(f) (West 2020); 730 ILCS 5/5-4.5-30(a) (West 2020).

¶ 97 In sentencing defendant to 8½ years' imprisonment, the trial court noted that he had been "under the eye of the court" since 2000, including both juvenile and adult probation, with support and services, but he continued to reoffend and was unsuccessful with probation compliance. The court found defendant deceptive and manipulative while on probation. The court also noted that it had considered the PSI and various addenda and evaluations, the evidence in aggravation and mitigation, and the evidence at the sentencing hearing. It also noted that it weighed and balanced the statutory factors, defendant's rehabilitative potential, and the financial impact of incarceration.

¶ 98 Preliminarily, the State argues that defendant forfeited the issue whether the trial court improperly sentenced him for his probation conduct rather than for the original offense. It contends that, in both his motion to reconsider sentence and at the hearing on the motion, defendant challenged his sentence as excessive and did not explicitly raise the argument he raises in this appeal. Defendant responds that he asserted in his motion that the trial court did not give proper weight to the polygraph evidence and its relation to his Facebook activity and his conduct concerning the cell phone search, both of which occurred during probation. We agree this argument encompasses an argument that the court improperly punished defendant for his probation conduct.

¶ 99    Turning to the merits, we conclude that the record shows that the trial court did not punish defendant for his conduct while on probation and that it properly considered the seriousness of the offense and mitigating evidence.  The sentenced it imposed is slightly above the midpoint of the sentencing range.  The court, as noted, explicitly stated that it considered the entire record (including the PSI, which documented defendant's childhood history of trauma, mental health issues, and drug and alcohol use), weighed and balanced the statutory factors, and considered the financial impact of incarceration.  It also noted that it considered defendant's rehabilitative potential, which, as noted, can encompass consideration of a defendant's conduct while on probation.  *Young*, 138 Ill. App. 3d at 135.  The court noted defendant's extensive history of probation, noncompliance with his probation terms, and properly noted his actions concerning his Facebook account.

¶ 100   In *People v. Varghese*, 391 Ill. App. 3d 866, 877 (2009), this court observed that "the record must clearly demonstrate that the trial court considered [the] defendant's original offense when fashioning his [or her] sentence."  In *Varghese*, we concluded that the court made "only a passing reference to [the] defendant's original offense" and thus "improperly commingled" his probation conduct with his original offense.  *Id.*  We vacated the sentence and remanded the case for a new sentencing hearing.  *Id.*  Defendant argues that, here, the trial court similarly focused its comments on defendant's behavior while on probation and after his probation was revoked and that the record lacks any indication that the court considered the cannabis offense in imposing its sentence.  We disagree.

¶ 101   First, we have cautioned that a "mechanical counting of 'mentions' " and their equating to " 'consider[ing]' " is not appropriate and that the proper inquiry is whether the record clearly shows that the trial court, in sentencing the defendant, considered his or her original offense.  *People v.*

*Miller*, 2021 IL App (2d) 190093, ¶ 27. Second, the court's comments in *Varghese*, which included that the defendant's conduct was " 'intolerable' " and " 'dangerous' " and which came immediately before it imposed the sentence, demonstrated that the court "improperly commingled" the probation conduct with the original offense. *Varghese*, 391 Ill. App. 3d at 877. The circumstances here are different and do not reflect an impassioned reaction by the court to defendant's probation conduct. Rather, the trial court, in contrast to *Varghese*, essentially determined that defendant lacked rehabilitative potential. *Young*, 138 Ill. App. 3d at 135 (court may consider the defendant's conduct while on probation in reassessing his or her rehabilitative potential). The court reviewed defendant's extensive history of probation and his noncompliance during these terms. This does not reflect that it punished defendant for his conduct during the term at issue, but shows how defendant's history bore on his rehabilitative prospects.

¶ 102 Defendant was pulled over during a traffic stop and, after a search of his trunk, the police found over 2000 grams but less than 5000 grams of cannabis in a vacuum-sealed container. Defendant admitted that he intended to sell it. Defendant asserts that trial court failed to consider the "significant" mitigating factors, including his young age; his full-time employment while on probation; participation in treatment; negative drug tests; history of mental health issues; difficult childhood; and commitment to his young daughter. He also points to Elkins' testimony that, all but for the allegation in the revocation petition, defendant was compliant with his probation. Defendant also points to Sobon's testimony. Sobon, the mother of defendant's daughter, testified that she had known defendant since he was 19 years old and that he had come a long way, was an amazing father, and wanted to "right his wrongs" and "be an example for his daughter." In allocution, defendant apologized to the court and expressed his desire to put his past behind him and focus on becoming a better person and his responsibilities as a parent.

¶ 103  Defendant also points to his traumatic childhood, including growing up in a violent and drug-infested area, living with his drug-using uncle, lack of supervision, sexual abuse by this uncle, suicidal thoughts, depression, ADHD diagnosis, and drug and alcohol use beginning at age 10.  He also notes his other mental health diagnoses.  Finally, defendant notes his youth and argues that the trial court did not adequately consider this factor in sentencing him for an offense that occurred when he was 23 years old.

¶ 104  The record shows that the trial court properly considered defendant's conduct while on probation in assessing his rehabilitative potential.  It noted that defendant continued to reoffend while on probation multiple times.  Defendant was on probation four times as a juvenile and four times as an adult and never successfully completed a sentence of probation.  He also failed to complete sex offender treatment.  Defendant's criminal history also includes multiple convictions for aggravated battery.  His sex offender evaluation noted that defendant was a moderate-high risk for being charged or convicted of another sexual offense.  He had been discharged from sex offender treatment in December 2019 and was arrested in November 2019 for domestic battery charges, which were pending.

¶ 105  Defendant, as the State notes, was 23 years old when he was arrested for the cannabis offense on October 24, 2017.  We, thus, reject his assertion concerning the developmental characteristics of juvenile brain and their persistence into emerging adulthood.  See *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 33 (individuals older than 21 when they commit offenses are adults for purposes of *Miller*-based claims).

¶ 106  Finally, we reject defendant's assertion that the trial court sentenced him for manufacturing cannabis.  The trial court, in noting that defendant's sentence would be concurrent with the sentence in 17 CF 2849, once mis-spoke and referred to the manufacture of cannabis.  There is no

other indication in the record that the court misunderstood the crimes for which defendant was convicted and sentenced.

¶ 107   In summary, the trial court did not abuse its discretion in resentencing defendant to 8½ years' imprisonment on the cannabis offense.

¶ 108                                III. CONCLUSION

¶ 109   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 110   Affirmed.